## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 09-39313 |
| DEEP MARINE HOLDINGS, INC.; et al. | § | (Jointly Administered) |
| | § | |
| | § | |
| Debtors | § | Chapter 11 |

| | | |
|---|---|---|
| DEEP MARINE 1, LLC, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| THE DEEP MARINE LIQUIDATING | § | |
| TRUST (AS SUCCESSOR TO DEEP | § | |
| MARINE TECHNOLOGY | § | |
| INCORPORATED, DEEP MARINE | § | |
| HOLDINGS, INC., DEEP MARINE 1, LLC | § | |
| DEEP MARINE 2, LLC, DEEP MARINE 3, | § | |
| LLC, AND DEEP MARINE 4, LLC); | § | |
| GENERAL ELECTRIC CAPTIAL | § | Adversary No. 10-3271 |
| CORPORATION; NOBLE DENTON | § | |
| MARINE, INC.; BNA MARINE | § | |
| SERVICES, LLC; OTTO CANDIES, LLC | § | |
| B&J MARTIN, INC.; NREC POWER | § | |
| SYSTEMS, INC.; CAPROCK | § | |
| COMMUNICATIONS, INC.; BOLLINGER | § | |
| SHIPYARDS TEXAS CITY, LP; | § | |
| BOLLINGER FOURCHON, LLC; | § | |
| ARAMARK US OFFSHORE SERVICES, | § | |
| LLC; AND CROSSMAR, INC., | § | |
| | § | |
| Defendants | § | |

## GENERAL ELECTRIC CAPITAL CORPORATION'S
## ANSWER AND CROSS-CLAIMS

JAX: 893023_5.DOC

General Electric Capital Corporation ("GE"), files this Answer to the Complaint filed by Deep Marine 1, LLC ("Plaintiff" or "DM1") and Cross-Claims against certain Defendants. **Terms used but not defined hereafter have the meanings they are given in the Complaint.**

1.      GE admits that DM1 was a debtor and debtor-in-possession prior to confirmation of the Plan on June 2, 2010, and refers the Court to the Plan for the complete terms thereof. GE denies the remaining allegations in paragraph 1 of the Complaint.

2.      GE admits that certain of the Defendants have filed proofs of claim in the Bankruptcy Case asserting maritime liens against the DMT Diamond. GE lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 2 of the Complaint.

3.      GE admits paragraphs 3-9 of the Complaint.

4.      GE admits the allegations in the first sentence of paragraph 10 of the Complaint, and that Seacor bid $10 million for the DMT Diamond in accordance with the terms of the purchase and sale agreement attached to the Complaint as Exhibit "A," and to which GE refers the Court for the complete terms thereof. GE denies the remaining allegations in paragraph 10 of the Complaint.

5.      GE admits paragraph 11 of the Complaint.

6.      GE admits the Confirmation Order was entered on June 2, 2010, as alleged in Paragraph 12 of the Complaint. GE refers the Court to the

Confirmation Order for the complete terms thereof, and accordingly denies the balance of Paragraph 12 of the Complaint.

7.    GE admits paragraphs 13 and 14 of the Complaint.

8.    GE lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 15 of the Complaint.

9.    GE admits that the Debtors' Plan indicates the Liquidating Trustee plans to assert surcharge claims under 11 U.S.C. §506(c) against the DMT Diamond.   GE denies that the Debtors or the Liquidating Trustee are entitled to surcharge the DMT Diamond for any fees and expenses of administration.   GE lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 16 of the Complaint.

10.    GE admits that certain Defendants named in paragraph 17 of the Complaint have filed proofs of claim asserting secured claims against the DMT Diamond.  GE is without sufficient information to admit or deny that certain Defendants have filed claims against the estate of DMT and, therefore, denies the remaining allegations contained in paragraph 17 of the Complaint.

11.    Paragraphs 18, 20, 22, and 24 of the Complaint do not contain any specific factual allegations, and no responsive pleading is required with respect to the averments in those paragraphs.

12.    GE admits the first and last sentences of Paragraph 19 of the Complaint.  GE denies the second sentence of Paragraph 19 of the Complaint, as there is no uncertainty over GE's entitlement to the proceeds at issue.

13.     GE admits the first sentence of paragraph 21 of the Complaint.  GE lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the second sentence of paragraph 21 of the Complaint.   The third sentence of paragraph 21 is a request for relief that GE is not required to admit or deny.

14.     GE denies the first sentence of paragraph 23 of the Complaint because, among other reasons, the closing of the sale of the DMT Diamond and the Related Equipment did not occur until after the filing of this Adversary Proceeding.   GE lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the second sentence of paragraph 23 of the Complaint.   The third sentence of paragraph 23 of the Complaint is a request for relief that GE is not required to admit or deny.

## GE'S ADDITIONAL/AFFIRMATIVE DEFENSES

15.     Otto Candies' lien claims are barred by fraud, for reasons described in GE's Cross-Claims against Otto Candies below.

16.     Otto Candies' lien claims are barred by waiver, laches, and/or estoppel.

17.     Upon information and belief, the claims of some of the other Defendants have been satisfied in whole or in part by payment.

18.     The Complaint fails to state a claim upon which relief can be granted for surcharge of the proceeds of GE's collateral pursuant to 11 U.S.C. §506(c).

## GE'S CROSS-CLAIMS AGAINST THE
## MARITIME JUNIOR LIEN CREDITORS

### Factual Background

19.     On or about November 30, 2006, National City Commercial Capital Corporation ("National City") made a $15 million loan ("Diamond Loan") to DM1 pursuant to a Loan Agreement dated as of November 30, 2006 ("Diamond Loan Agreement"), executed by DM1 and National City.

20.     The Diamond Loan is evidenced by a Secured Promissory Note ("Diamond Note") dated November 30, 2006, in the original principal amount of $15,000,000, executed by DM1, as maker, payable to the order of National City, as payee.

21.     The Diamond Note was secured by (i) a United States first priority Preferred Mortgage and Deed of Covenants ("Diamond Mortgage") on the Borrower's United States flag vessel "DMT Diamond", Official No. 1091373, and other collateral described in the Diamond Loan Agreement; (ii) an Earnings Assignment covering, among other things, a Bareboat Charter Party dated April 22, 2005 between DM1 and DMT, and all earnings of the DMT Diamond, and (iii) an Insurance Assignment covering, among other things, all insurance proceeds in respect of the DMT Diamond and all claims and other monies and claims for monies due and to become due under the insurance policies, all of which loan documents were executed by the parties of even date with the Diamond Note.

22.     The Diamond Mortgage was filed with the United States Coast Guard National Vessel Documentation Center on or about December 1, 2006.

23.     On June 18, 2007, National City assigned all of its right, title and interest in the Diamond Loan Agreement, Diamond Note, Diamond Mortgage, Guarantees, and other loan documents to GE.

24.     True and correct copies of the Diamond Mortgage, the Diamond Note, and the Diamond Loan Agreement are attached to GE's proof of claim filed against DM1 on or about March 31, 2010.

25.     During 2008 and 2009, and thereafter, DM1 violated the Diamond Loan Agreement by failing to keep the vessel clear of liens, encumbrances, or charges.

26.     During the latter part of 2009, the DMT Diamond required major repairs, and as a result DM1 cold-stacked the vessel in Louisiana.  Thereafter, DM1 failed to maintain the DMT Diamond in good working condition, in violation of the  Diamond Mortgage.

27.     DM1 also committed payment defaults.  On November 16, 2009, GE gave written notice that DM1 had defaulted under the Diamond Note by, among other things, failing to make installment payments due thereunder.

28.     Despite demand, no further payments were made by DM1 on the Diamond Note.

29.     DM1 filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code on December 4, 2009.  As of that date a total of $13,796,587.31 in principal, accrued interest, and other charges were due and owing under the Diamond Note.

30.     On June 2, 2010, the Bankruptcy Court entered the Confirmation Order, confirming the Plan and approving the sale of the Debtors' assets.

31.     The Plan provides for the following classification of claims filed against DM1:

(a)     Class C1:  Priority Non-Tax Claims;
(b)     Class C2:  Maritime Senior Secured Claims;
(c)     Class C3:  Secured Mortgage Claim of GE;
(d)     Class C4:  Maritime Junior Secured Claims;
(e)     Class C5:  Other Secured Claims;
(f)     Class C6:  General Unsecured Claims; and
(g)     Class C7:  Subordinated Claims.

32.     On July 9, 2010, the DMT Diamond was sold for $10 million to Seacor.  The funds have been paid into the registry of this Court.

33.     The Plan became effective on the Effective Date, July 12, 2010.

34.     GE's claim against DM1, secured by a preferred ship mortgage on the DMT Diamond, is treated under Class C3 of the Plan.  Even ignoring the disputed Class C2 claim asserted by Otto Candies (discussed below), the $10 million in proceeds from the sale of the DMT Diamond is not sufficient to pay GE's claim secured by the DMT Diamond in full.

35.     Noble Denton Marine, Inc., BNA Marine Services, LLC, B&J Martin, Inc., NREC Power Systems, Inc., Caprock Communications, Inc., Bollinger Shipyards Texas City, LP, Bollinger Fourchon, LLC, Aramark U.S. Offshore Services, LLC, and Crossmar, Inc. (collectively the "Maritime Junior Secured Creditors") have each filed secured proofs of claim in the DM1 Bankruptcy Case, asserting maritime liens against the DMT Diamond.

36.     The services and materials furnished by Noble Denton Marine, Inc. to the DMT Diamond were provided after the perfection of GE's preferred ship mortgage on the DMT Diamond.   Noble Denton Marine, Inc.'s maritime lien against the DMT Diamond arose after the perfection of GE's preferred ship mortgage against the DMT Diamond.

37.     The services and materials furnished by BNA Marine Services, LLC to the DMT Diamond were provided after the perfection of GE's preferred ship mortgage on the DMT Diamond.   BNA Marine Services, LLC's maritime lien against the DMT Diamond arose after the perfection of GE's preferred ship mortgage against the DMT Diamond.

38.     The services and materials furnished by B&J Martin, Inc. to the DMT Diamond were provided after the perfection of GE's preferred ship mortgage on the DMT Diamond.   B&J Martin, Inc.'s maritime lien against the DMT Diamond arose after the perfection of GE's preferred ship mortgage against the DMT Diamond.

39.     The services and materials furnished by NREC Power Systems, Inc. to the DMT Diamond were provided after the perfection of GE's preferred ship mortgage on the DMT Diamond.   NREC Power Systems, Inc.'s maritime lien against the DMT Diamond arose after the perfection of GE's preferred ship mortgage against the DMT Diamond.

40.     The services and materials furnished by Caprock Communications, Inc. to the DMT Diamond were provided after the perfection of GE's preferred

ship mortgage on the DMT Diamond.  Caprock Communications, Inc.'s maritime lien against the DMT Diamond arose after the perfection of GE's preferred ship mortgage against the DMT Diamond.

41.     The services and materials furnished by Bollinger Shipyards Texas City, LP to the DMT Diamond were provided after the perfection of GE's preferred ship mortgage on the DMT Diamond.   Bollinger Shipyards Texas City, LP's maritime lien against the DMT Diamond arose after the perfection of GE's preferred ship mortgage against the DMT Diamond.

42.     The services and materials furnished by Bollinger Fourchon, LLC to the DMT Diamond were provided after the perfection of GE's preferred ship mortgage on the DMT Diamond.   Bollinger Fourchon, LLC's maritime lien against the DMT Diamond arose after the perfection of GE's preferred ship mortgage against the DMT Diamond.

43.     The services and materials furnished by Aramark U.S. Offshore Services, LLC to the DMT Diamond were provided after the perfection of GE's preferred ship mortgage on the DMT Diamond.     Aramark U.S. Offshore Services, LLC's maritime lien against the DMT Diamond arose after the perfection of GE's preferred ship mortgage against the DMT Diamond.

44.     The services and materials furnished by Crossmar, Inc. to the DMT Diamond were provided after the perfection of GE's preferred ship mortgage on the DMT Diamond.  Crossmar, Inc.'s maritime lien against the DMT Diamond

arose after the perfection of GE's preferred ship mortgage against the DMT Diamond.

45.     The maritime liens asserted by each of the Maritime Junior Secured Creditors are junior in priority to GE's preferred ship mortgage against the DMT Diamond, and should accordingly be treated under Class C4 of the Plan.

## COUNT I
### (Determination of Existence, Perfection, Priority and Validity of The Liens of the Maritime Junior Secured Creditors)

46.     GE incorporates each factual allegation set forth above, the same as though restated herein.

47.     GE seeks a judicial determination as to whether the maritime liens asserted by each of the Maritime Junior Secured Creditors are valid in amount, properly perfected, and otherwise valid.

48.     GE seeks a judicial determination that the maritime liens asserted against the DMT Diamond by each of the Maritime Junior Secured Creditors are junior and subordinate in priority to GE's preferred ship mortgage on the DMT Diamond, and are accordingly treated under Class C4 of the Plan.

## COUNT II
### (Declaratory Relief For Lien Priority And For Relief Of Escrow Funds)

49.     GE incorporates each factual allegation set forth above, the same as though restated herein.

50.     This Court has jurisdiction to declare the rights, status and legal relations between the parties to this action with respect to the Plan and the proceeds of the DMT Diamond.

51.     All parties with a potential interest in the proceeds of the DMT Diamond are parties to this action.

52.     DM1 and its affiliates breached the Diamond Loan Agreement and the Diamond Mortgage.

53.     Each of the Maritime Junior Secured Creditors had actual or constructive notice of GE's preferred ship mortgage when they contracted with DM1 or DMT to provide services or materials with respect to the DMT Diamond.

54.     Each of the Maritime Junior Secured Creditors had actual or constructive notice that neither DM1, DMT, the captain, nor any other person had authority to create or allow the maritime lines against the DMT Diamond they have asserted in the Bankruptcy Case.

55.     GE seeks declaratory relief that the maritime liens asserted against the DMT Diamond by each of the Maritime Junior Secured Creditors are either invalid, or are junior and subordinate in priority to GE's preferred ship mortgage on that vessel.

56.     GE seeks an order directing disbursement of the proceeds of the DMT Diamond equal to the amount reserved to satisfy the competing claims  to those proceeds asserted by each of the Maritime Junior Secured Creditors.

57.     GE seeks an award of attorneys' fees and expenses incurred in obtaining declaratory relief of its lien priority and the release of the proceeds of its collateral from any Maritime Junior Secured Creditor who contests GE's superior right to the proceeds.  Under the circumstances such an award is just and equitable, and should be allowed.

## GE'S CROSS-CLAIMS AGAINST OTTO CANDIES

58.     GE incorporates each factual allegation set forth above, the same as though restated herein.

### Additional Factual Background

**A.      Summary**

59.     Otto Candies was a part-owner and an insider in control of the Debtors' business during all periods relevant to this action.  Otto Candies has filed notices pursuant to 11 U.S.C. 546(b) and proofs of claim in, *inter alia*, the DM1 Bankruptcy Case, claiming to hold preferred maritime liens on the DMT Diamond for "reimbursement" of amounts advanced for crewman's wages under the general maritime law of the United States (the "Insider Priming Liens").  Otto Candies claims the Insider Priming Liens are senior in priority to GE's preferred ship mortgage.  GE disputes the nature, extent, validity and claimed priority of the Insider Priming Liens which are, by law, subordinate to GE's preferred maritime lien, if they are liens at all.  Further, GE seeks to subordinate the Insider Priming Liens based on Otto Candies' inequitable conduct described herein.  Finally, to the extent any Insider Priming Lien against

12

the DMT Diamond is allowed and operates to prime GE's liens, GE seeks damages for the resulting impairment of its collateral, and for other wrongful conduct described herein.

**B.     Otto Candies' Insider Status With Respect To DM1 And Its Knowledge Of The Terms Of The Diamond Loan**

60.     Otto Candies originally sold the DMT Diamond to DM1.  The sale was financed by a loan of $15,200,000 (the "Candies Loan") made by Otto Candies to DM1 pursuant to a senior secured convertible note loan dated April 22, 2005 (the "Candies Note").  The Candies Loan was secured by a preferred ship mortgage dated April 22, 2005 on the DMT Diamond (the "Candies Mortgage").

61.     The Candies Loan and the Candies Mortgage were released at closing of the Diamond Loan.  Based on its direct connection with the Diamond Loan, and its insider/control/ownership position with DM1 and its affiliates, Otto Candies was fully aware of the terms of the Diamond Loan Agreement and the Diamond Mortgage, including the contractual commitments by DM1 set forth hereafter.

62.     Article II, Section 7 of the Diamond Mortgage both prohibited, and required DM1 to cause the removal or discharge of, liens against the DMT Diamond, as follows:

> Section 7. <u>Removal of Liens</u>.  Except for the lien of this Mortgage Deed, the Shipowner will not suffer to be continued any lien, encumbrance or charge on the Vessel and in due course and in any event within thirty (30) days after the same becomes due and payable or, upon the same being due and payable, within fourteen

(14) days after being requested to do so by the Mortgagee, the
Shipowner will pay or cause to be discharged or make adequate
provision for the satisfaction or discharge of all claims or demands,
and will cause the Vessel to be released or discharged from any
lien, encumbrance or charge therefore.

63.    The accrual of Insider Priming Liens against the DMT Diamond
(presuming Otto Candies has any liens at all) was a direct breach of the Diamond
Mortgage.

64.    Article II, Section 9 of the Diamond Mortgage required DM1 to
maintain the DMT Diamond in a good state of repair, as follows:

The Shipowner will at all times and without cost or expense to the
Mortgagee maintain and preserve, or cause to be maintained and
preserved, the Vessel and all its equipment, outfit and
appurtenances, sufficiently tackled, appareled, furnished,
equipped, tight, staunch, strong, in good condition, working order
and repair and in all respects seaworthy and fit for its intended
service, and will keep the Vessel, or cause her to be kept, in such
condition as will entitle her to the highest classification and rating
for vessels of the same size, age and type in American Bureau of
Shipping or other classification society of like standing approved
by the Mortgagee.

65.    In addition to knowing the terms of the Diamond Loan prohibited
liens on the DMT Diamond, Otto Candies also knew the loan agreements
required DM1 to report violations of the exact nature that Otto Candies itself has
attempted to orchestrate through the device of the Insider Priming Liens.

66.    For example, Section 5.01(c)(i) of the Diamond Loan Agreement
required DM1 to advise GE of any Event of Default under the agreement:  "The
Borrower shall promptly inform the Lender of a Default or an Event of Default."
Section 6.01(j) of the Diamond Loan Agreement provides that Events of Default

include any event of default under the Diamond Mortgage.  Events of default under the Mortgage, in turn, include non-observance and performance of the covenant against liens in Article II, section 7 of the Diamond Mortgage referred to above.

67.     Otto Candies' proof of claim filed against DM1, demonstrates that it began accruing maritime lien charges for seaman's wages  against the DMT Diamond on December 1, 2006, *which was the day after the closing of the Diamond Loan.*  Hence, one can easily infer that Otto Candies planned to do so at the time the Diamond Loan was made.

68.     DM1 and its insiders, including Otto Candies, had *both* a contractual duty to refrain from allowing such liens to accrue, and a duty to report such liens as they were accruing.  Instead, DM1 and its insiders secretly ran up millions of dollars worth of alleged "wage" liens on the DMT Diamond – liens that, upon information and belief, were designed to prime GE's collateral.

**C.     Otto Candies' Insider Status And Self-Dealing With  the Debtors**

69.     As stated above, Otto Candies asserts Insider Priming Liens against the DMT Diamond for periods dating back to December 1, 2006, the day after the closing of the Diamond Loan.   Otto Candies has been a substantial owner of DM1 during the entire period it wrongfully accrued the Insider Priming Liens. In March 2007, Otto Candies owned 22.5% of DMT, the ultimate parent of DM1. By June of 2008, after a corporate reorganization, it owned 40% of DMH, the ultimate parent of both DMT and DM1.  As of the December 2009 filing of the

Debtors' Chapter 11 cases, Otto Candies and NJK Holdings Corporation ("NJK"), an entity controlled by Nasser Kazeminy ("Kazeminy"), were each fifty percent shareholders of DMH.

70.     Upon information and belief, Otto Candies increased its ownership interest in DMT and DMH and its affiliates over time by funding loans that were later converted to equity.   The Candies Loan, pursuant to which DM1 originally acquired the DMT Diamond, was one of these loans that was converted into equity.

71.     On April 22, 2005, at the same time DM1 acquired the DMT Diamond pursuant to the Candies Loan, DMT and DM1 entered a "Bareboat Charter Party" agreement ("Charter Agreement") pursuant to which DMT agreed to charter the vessel from DM1.   On the same day, DMT and Otto Candies entered into a "Vessel Operating Agreement" (the "Operating Agreement") pursuant to which Otto Candies agreed to provide crewing and other services to DMT with respect to the DMT Diamond.

72.     Otto Candies was fully aware of the terms of the Diamond Loan Agreement, including the lien prohibitions cited earlier, when it accepted the benefits of the National City financing.

73.     GE's predecessor required Otto Candies to execute a letter dated November 27, 2006 (the "Confirmation Letter"), immediately prior to closing the Diamond Loan.   The Confirmation Letter signed by Otto Candies expressly (1) acknowledged that the Diamond Loan would be secured by a first preferred ship

mortgage on the DMT Diamond in favor of National City, and (2) confirmed, *inter alia*, (a) that the debt evidenced by the Candies Note was to be converted into common stock, (b) that DM1 was not a party to the Operating Agreement, and (c) that DM1 had "no further obligations or liabilities of any kind to Otto Candies."

74.     In the context of the closing of a $15 million loan secured by a preferred ship mortgage, Otto Candies' statements in the Confirmation Letter either expressly or implicitly represented that neither DM1 nor its vessel would be responsible for or incur obligations for seaman's wages payable by DMT under the Operating Agreement.

75.     The confirmations and statements made in the Commitment Letter, and the terms and covenants in the Diamond Mortgage prohibiting the accrual of liens against the DMT Diamond, were material inducements to the making of the Diamond Loan.

76.     Finally, DMT's and DM1's transactions with Otto Candies which have given rise to the Insider Priming Liens, including the terms of the Operating Agreement, were not arms-length.  Upon information and belief, Otto Candies charged DMT above-market prices for crews, maintenance and equipment.

**D.     Otto Candies' And The Debtors' Concealment Of The Accrual Of The Insider Priming Liens Caused Serious Prejudice To GE**

77.     The Operating Agreement required DMT to pay Otto Candies within 30 days of receipt of a monthly invoice.  Notwithstanding this, and knowing that the terms of the Diamond Mortgage required that any liens of any

type against the DMT Diamond had to be promptly discharged, Otto Candies accrued astronomical crewmen's wage claims for three years, while at the same time concealing its attempt to prime GE's collateral.

78.     In addition, that $5,668,890.54 in asserted Insider Priming Liens were allowed to accrue is evidence of the non-arm's length nature in which Otto Candies dealt with DMT, DM1, and their affiliates.  No rational third party would have allowed itself to go unpaid for almost three years to the extent of the amounts asserted in the Insider Priming Liens.

79.     Otto Candies' concealment of the accrual of the Insider Priming Liens was in direct violation of the Diamond Mortgage.  As these liens were accruing, Otto Candies both knew full well, and was reminded on many occasions, of both the prohibitions in the Diamond Loan Agreement against Insider Priming Liens against GE's collateral, and that GE would not permit liens of this type.

80.     For example, in late July 2008, GE was notified by Bollinger Texas City, LLC ("Bollinger Texas") that Bollinger Texas was filing notices of maritime liens against the DMT Diamond on account of work Bollinger Texas had performed thereon.  In response, GE demanded that DM1 pay the outstanding amounts to Bollinger Texas and cause any such liens to be immediately released, as the liens violated the obligations of DM1 under the Diamond Loan Agreement and Diamond Mortgage.   DM1/DMT complied, and the liens were released in early September 2008.

81. The scheme described above was kept hidden from GE during negotiations that started in late 2008 concerning a proposed forbearance agreement (the "Forbearance Agreement") relating to the loan (the "Emerald Loan Agreement") secured by the DMT Emerald, by which DMT requested GE's affiliate to forbear from enforcing its rights under the Emerald Loan Agreement and its preferred ship mortgage secured by the DMT Emerald (the "Emerald Mortgage"). The DMT Emerald was owned at the time by DM1's affiliate, DM2, which, like DM1, was owned 100% by DMT. Otto Candies has assessed and asserted, in the Bankruptcy Case, the same sort of liens for seaman's wages accrued from 2007-09 against the DMT Emerald as it has asserted against the DMT Diamond pursuant to the Insider Priming Liens. The Emerald Loan Agreement contained the same type of prohibitions against liens against that vessel as are found in the Diamond Mortgage.

82. During negotiations over terms of the proposed Forbearance Agreement, including the distribution of proceeds of a proposed sale of certain DMT assets, GE's affiliate's representatives requested a description in the agreement of the indebtedness that would be repaid by such proceeds, including amounts due Otto Candies. Despite the negotiation and exchange of numerous drafts of the Forbearance Agreement (which was never finalized), DMT never provided a description of the amounts payable to Otto Candies, and never disclosed the existence of the alleged priming liens for seaman's wages.

83.     Additionally, under the proposed Forbearance Agreement, DMT, DMH, and DM2 were required to affirm all representations and warranties they had made in the Emerald Loan Agreement and Emerald Mortgage, and represent that they remained true and correct.  DMT's counsel prepared a draft Schedule purporting to list the specific instances where such representations were not true or correct.  The Schedule did not provide any indication that the DMT Emerald was subject to any liens in violation of the Emerald Loan Agreement.  And in no correspondence during the course of the negotiations did DMT or its counsel indicate that any liens were accruing on the DMT Emerald, let alone the type of massive seaman's wage claims Otto Candies has apparently accrued, and has sought to prime GE with.

84.     Because the same GE departments administered the loans secured by the DMT Diamond and DMT Emerald, discovery of these practices with respect to the DMT Emerald would have led to discovery of the same practices (were they taking place) with respect to the DMT Diamond.

85.     In June of 2009, GE learned that DM1 had again breached its obligations under the Diamond Loan Agreement and Diamond Mortgage, when it was advised that Bollinger Fourchon had recorded liens against the DMT Diamond on June 8, 2009. Discussions between GE and DM1 concerning the release of these liens continued during late summer 2009 in connection with other negotiations concerning, *inter alia*, liens which had been recorded on the DMT Emerald.  In correspondence with the DMT GE made it unmistakably clear

that releases of any liens on the DMT Diamond and the DMT Emerald were of utmost importance.

86.     The first indication to GE management of Otto Candies' concealed priming scheme surfaced on August 31, 2009, after a default notice had been issued under the loan secured by the DMT Emerald.

87.     An email from counsel for Otto Candies and Kazeminy setting out a proposal to deal with various pending DMT Emerald defaults included the following term:  "Otto Candies, L.L.C. will agree to subordinate any liens it may have against the Vessel that secure amounts owed to it for providing crews for the Vessel to all liens securing the Borrower's obligations under the Loan Agreement."

88.     Still, this email did not disclose either the amount of the alleged claim for seaman's wages, or that Otto Candies had attempted the same scheme with respect to the DMT Diamond.

89.     In the course of the negotiations that followed, GE management was provided with DMT payables records showing large outstanding balances due to Otto Candies.  The schedule did not, however, identify what the accounts payable related to, or that Otto Candies would be asserting priming liens for the amounts claimed against GE's and its affiliate's collateral.

90.     After the delivery of the default notice, and during the course of the negotiations described above, DMT and Otto Candies were made aware that GE would not permit senior or priming liens against its collateral.  Hence, as an

insider, Otto Candies not only knew of the prohibitions against liens in the loan agreement and mortgage cited earlier; it knew that GE, like any other lender, took these prohibitions seriously, and refused to tolerate priming liens against its collateral.

91.     The first time Otto Candies *ever* notified GE of the amount of the Insider Priming Liens against the DMT Diamond it had been secretly accruing since December 1, 2006, and that it sought to prime GE's mortgage by this amount, was on February 19, 2010, during the Bankruptcy Case.  On that day Otto Candies filed, among other things, a notice pursuant to 11 U.S.C. §546(b) and a proof of claim alleging it held a preferred lien on the DMT Diamond of more than $5.6 million for reimbursement of seaman's wages.

92.     In addition to the concealment and wrongful accrual of the Insider Priming Liens, DMT, DM1 and Otto Candies violated the Diamond Mortgage and Diamond Loan Agreement by failing to maintain the DMT Diamond in proper state of repair, and failing to obtain and maintain all operational and regulatory inspections required for the vessel to be operational.

93.     When the DMT Diamond was sold at auction, it required at least $1.5 – 2 million in known repairs, with the potential for more.  As a result, the sales price obtained at auction was well below both its fair market value, and the value that would have been realized had the vessel been maintained in a state of good repair.

94.     The prejudice to GE from DMT's and Otto Candies' concealment and failure to promptly disclose the scheme to accrue massive priming liens against the DMT Diamond is real.   The accrual of the Insider Priming Liens started immediately after the closing of the Diamond Loan.  Had GE been made aware of the potential for the accrual of any of these priming liens when Otto Candies' first invoice to DMT under the Operating Agreement went unpaid, years ago, it would have required DM1/DMT to have the liens paid and released (as it did with respect to the other liens it learned of), or it would have declared default under the Diamond Loan Agreement and foreclosed its preferred ship mortgage and sold the vessel.

95.     In either case, GE would have been in a far better position with respect to its collateral, because (1) either all liens would have been released, or (2) had GE had enforced the Diamond Mortgage in 2007 and sold the vessel, the DMT Diamond was in better condition then than it was when it was recently sold, and would have sold for much more than it sold for in the recent auction.

96.     Finally, if the Insider Priming Liens are allowable as asserted, GE would have received millions more in proceeds from a liquidation in 2007/08, because Insider Priming Liens would not have accrued after the foreclosure.

### COUNT I
**(Declaration of Existence, Priority and Perfection of Insider Priming Liens)**

97.     GE incorporates each factual allegation set forth above, the same as though restated herein.

98.     GE seeks a declaration of the existence, priority and perfection of the Insider Priming Liens asserted by Otto Candies against the DMT Diamond.

99.     Otto Candies is not a seaman.  It is an owner/insider that allegedly provided staffing and other services to DMT (not DM1) with respect to the operation of the DMT Diamond.

100.    Otto Candies was an insider in a position to, and who did, control the operation and management of the Debtors.

101.    All seamen who served on the DMT Diamond were paid all wages they were due.

102.    Upon information and belief, DM1 is not now, and never was, a party to the Operating Agreement.

103.    Otto Candies charged substantial insider markups and margins, as great as 40%, on the seaman's wage claims underlying the Insider Priming Liens. The insider profit or overhead amounts are not seaman's wages entitled to preferred maritime lien status.

104.    A large portion of the Insider Priming Liens consists of interest on unpaid charges at the incredible rate of 18%.  Ignoring the excessive rate, there is no legal basis for characterizing interest as a "seaman's wage" entitled to preferred maritime lien status.

105.    Otto Candies possessed knowledge of DM1's and the DMT Diamond's finances and credit, and was not a "stranger to the vessel" when it accrued the Insider Priming Liens against the DMT Diamond.

106.   At no point did Otto Candies rely on the credit of DMT Diamond when it allowed the Insider Priming Liens to accrue.

107.   For these and other reasons, insiders, including investors and shareholders in a ship-owning company, are not permitted to assert a maritime lien on a vessel in which they possess an ownership interest.  Simply put "you cannot lien your own ship."

108.   The Court should declare the Insider Priming Liens null and void, or at a minimum, subordinate to the liens of GE to the DMT Diamond.

## COUNT II
### (Estoppel to Assert Insider Priming Liens)

109.   GE incorporates each factual allegation set forth above, the same as though restated herein.

110.   Otto Candies was an owner and an insider in control of the Debtors, who managed the Debtors into a bankruptcy that delayed and frustrated payment to GE and other third-party creditors.

111.   In particular as to the DMT Diamond, the proceeds from the sale of the vessel are insufficient to pay in full the claims of GE, let alone the claims of the Maritime Junior Secured Creditors.

112.   Otto Candies held a fiduciary position, owed fiduciary duties to the Debtors, and given the zone of insolvency in which the Debtors operated, owed fiduciary duties to GE and other creditors.

113.   Otto Candies was an "integral part of the Debtors' management" team.

114.   Otto Candies was not a "stranger" to the DMT Diamond.

115.   Otto Candies wrongfully concealed its plan to accrue and then assert Insider Priming Liens against the DMT Diamond.

116.   Otto Candies is estopped from asserting the Insider Priming Liens based on its actions, inactions, and failure to disclose that combined to reasonably lead GE to believe that Otto Candies was not relying on lien rights in its dealings with the DMT Diamond, DMT, and DM1.

117.   For these reasons, Otto Candies is barred and estopped from asserting the Insider Priming Liens.

## COUNT III
### (Equitable Subordination of Insider Priming Liens)

118.   GE incorporates each factual allegation set forth above, the same as though restated herein.

119.   Otto Candies was an owner and an insider that had the power to, and did, control the operation of the Debtors.

120.   Otto Candies' conduct and dealings with respect to the Debtors was wrongful and inequitable, and resulted in injury to GE and other innocent creditors.   The wrongful and inequitable conduct and dealings included, but were not limited to, the following:

    (a)   Otto Candies operated the Debtors in a "zone of insolvency" or insolvent condition, and by doing so caused a deepening insolvency of the Debtors;

    (b)   Otto Candies concealed the accrual of the Insider Priming Liens, and similar liens against other DMT vessels;

      (c)      Otto Candies was paid dividends and distributions from DM1 or its affiliates that caused or contributed to their insolvency;

      (d)      Otto Candies caused the Debtors to incur lien obligations in direct violation of the contractual prohibitions against such liens in the loan agreement[s] and mortgage[s] pursuant to which Otto's Candies was paid substantial sums;

      (e)      Otto Candies caused or permitted the Debtors to fail to maintain the DMT Diamond in a state of good repair, in violation of the Diamond Loan Agreement;

      (f)      Otto Candies caused or contributed to the undercapitalization of the Debtors; and

      (g)      Otto Candies transacted business with the Debtors on terms that were not arms-length, profiting at the expense of creditors of those entities and contributing to or ultimately causing the Debtors' insolvency.

121.    For these and other reasons, all claims of Otto Candies against DM1 and the DMT Diamond should be equitably subordinated to the claims of GE and other creditors, based on the injury and harm Otto Candies has caused these innocent creditors through its wrongful and inequitable conduct.

122.    In connection with the remedy of subordination, all Otto Candies liens on the DMT Diamond should be expunged.

### COUNT IV
### (Recharacterization of Debts Underlying the Insider Priming Liens)

123.    GE incorporates each factual allegation set forth above, the same as though restated herein.

124.    The obligations underlying the Insider Priming Liens should be treated as, and were in substance, equity advances to DMT or DM1, for the following reasons, among others:

(a)    At relevant times, Otto Candies was a controlling owner/insider of the Debtors;

(b)    There is no contract between Otto Candies and DM1 evidencing the obligations;

(c)    There was no fixed maturity date or schedule for DM1 to pay the obligations;

(d)    There was no agreement between Otto Candies and DM1 for the interest assessed;

(e)    DM1 had no available source of income to repay the obligations;

(f)    DM1 and its affiliated debtors were undercapitalized;

(g)    Taking into account dealings between the insiders, there was an identity of interest between Otto Candies and the equity holders of the Debtors;

(h)    There was no security for the obligations at the time the advances were made;

(i)    DM1 could not have financed the seaman's wages advanced by Otto Candies from outside lending institutions;

(j)    There was no sinking fund established to pay the obligations; and

(k)    Otto Candies had a history of converting loans it made to DMT, and DM1 specifically, into common stock of the enterprise.

125.    The obligations underlying the Insider Priming Liens should be recharacterized and treated as equity interests, and all liens arising from the obligations should accordingly be expunged.

## COUNT V
### (Fraud By Omission)

126.    GE incorporates each factual allegation set forth above, the same as though restated herein.

127.    Otto Candies did not disclose to GE or its predecessor the plan to accrue the Insider Priming Liens, either at the time the Diamond Loan was made or at anytime thereafter, until the bankruptcy filing.

128.    As evidenced by the fact that the accrual of the Insider Priming Liens commenced the day after the Diamond Loan was made, Otto Candies intended to do so at the time of the loan.

129.    Otto Candies' plan to accrue millions of dollars worth of Insider Priming Liens against GE's collateral was a material fact within the knowledge of Otto Candies at the time the Diamond Loan was made.

130.    The amount of the Insider Priming Liens accruing against the DMT Diamond was a material fact within the knowledge of Otto Candies at all times after the Diamond Loan was made, and as the liens accrued.

131.    Otto Candies knew or certainly should have known that the Diamond Mortgage and Diamond Loan Agreement both prohibited the accrual of the Insider Priming Liens against the DMT Diamond, and required the Debtors to report any such liens to GE.

132.    Both at closing of the Diamond Loan and at all times thereafter, through the bankruptcy, Otto Candies knew that GE was ignorant of the plan to accrue the Insider Priming Liens, and the amount of such liens accruing against the DMT Diamond.

133.    Both at closing of the Diamond Loan and at all times thereafter, through the bankruptcy, Otto Candies knew that GE did not have an equal

opportunity to discover the plan to accrue the Insider Priming Liens, or the amount of such liens accruing against the DMT Diamond.

134.    Otto Candies intended to cause GE and its predecessor to both make the Diamond Loan and to refrain from exercising remedies under the Diamond Mortgage and Diamond Loan Agreement by not disclosing the plan to accrue the Insider Priming Liens, and the amount of the lien claims as they accrued.

135.    GE reasonably relied on Otto Candies' acts and omissions, and has suffered losses, described above, as a direct result of Otto Candies' fraudulent failure to disclose the plan underlying the Insider Priming Liens.

**COUNT VI**
**(For Recovery of Damages Against Otto Candies for Tortious Interference and Other Misconduct That Caused A Diminution in Value of GE's Collateral)**

136.    GE incorporates each factual allegation set forth above, the same as though restated herein.

137.    At relevant times, Otto Candies was a controlling owner/insider of the Debtors, with full knowledge of the prohibitions against Insider Priming Liens set forth in the contracts by which the Diamond Loan was made.

138.    At all relevant times, GE was a party to valid and existing contracts with DM1 respecting the condition and operation of the DMT Diamond and DM1, including the Diamond Mortgage and the Diamond Loan Agreement.

139.    At all relevant times, Otto Candies had knowledge of the contracts between GE and DM1.

140.    As a controlling owner/insider of the Debtors, and based on the pattern of wrongdoing and self-dealing described above, Otto Candies caused DM1 to violate the provisions of the Diamond Mortgage and the Diamond Loan Agreement.

141.    GE suffered loss from this breach because the value of the DMT Diamond—its collateral, was impaired.  Hence, the proceeds from the sale of the vessel were less than would have been the case had the vessel been maintained in the state of repair required by the loan documentation.

142.    GE also incurred losses from DM1's breach of the contracts as a result of the  accrual of the Insider Priming Liens against the vessels.

143.    Otto Candies caused DM1 to breach its contracts with GE, as outlined above.  It did so in bad faith, with knowledge that its actions with respect to the DMT Diamond would cause DM1 to violate its contracts with GE.

144.    Otto Candies caused DM1 to breach its agreements with GE for the purpose of furthering its own pecuniary interests.  Otto Candies profited, or sought to profit, from the breaches by DM1 of the loan agreements that Otto Candies caused or permitted to occur.

145.    Otto Candies caused DM1 to conceal the breach of its agreements with GE until after liens in excess of $5 million dollars had accrued and DMT, DMH, and DM1 were in no condition to pay back those amounts.  It did so through wrongful devices that included misrepresentation, omission, and concealment.

146.    GE has incurred damages from Otto Candies' misconduct and interference with GE's contractual relations with DM1 equal to the loss of sale proceeds that would have been received from the disposition of the DMT Diamond had the vessel been maintained as the loan documentation required.

147.    In addition, to the extent Otto Candies is allowed or permitted and prevails in the assertion of, any form of Insider Priming Lien on the DMT Diamond, GE will suffer additional damages to the extent its recoveries on its collateral are not sufficient to pay GE's claims in full.

**COUNT VII**
**(Conversion against Otto Candies With Respect to**
**Proceeds of the DMT Diamond)**

148.    GE incorporates each factual allegation set forth above, the same as though restated herein.

149.    The DMT Diamond has been sold at auction and the proceeds of the sale have been received in the form of cash, which constitutes personal property and proceeds of GE's collateral.

150.    Through the artifice and device of the Insider Priming Liens, Otto Candies has exercised wrongful dominion and control over the cash proceeds from the sale of the DMT Diamond which rightfully belong to GE, by seeking to have those funds escrowed and not paid to GE.

151.    Otto Candies has asserted rights against the proceeds of GE's collateral with malice, or in gross disregard for the interests of GE.

152.    GE has been damaged by Otto Candies' wrongful assertion of dominion and control over the proceeds of GE's collateral.   These damages include the detention of GE's property, lost interest and earnings on such funds, as well as attorneys' fees and expenses GE has incurred in the litigation of this matter.

### Prayer For Relief On Cross-Claims

153.    GE prays for the following relief, after trial or summary disposition of this case, as to the maritime liens asserted by each of the Maritime Junior Secured Creditors:

a)   Judgment determining the existence, perfection and validity of each of the liens;

b)   Judgment determining the liens and claims of the Maritime Junior Secured Creditors to the DMT Diamond proceeds junior to GE's preferred ship mortgage lien and claims to the proceeds, and classifying such claims under Class C4 of the Plan;

c)   Judgment expunging any such lien or claim of the Maritime Junior Secured Creditors to the DMT Diamond proceeds;

d)   Declaratory relief consistent with the foregoing;

e)   An Order directing the disbursement of the proceeds of the DMT Diamond from the registry of the Court to GE;

f)   An award of attorneys' fees and expenses incurred by GE in litigating this action;

g)  Costs of court; and

h)  Such other and further relief as GE may show itself entitled.

154.    GE prays for the following relief, after trial or summary disposition of this case, as to the Insider Priming Liens asserted by Otto Candies against the DMT Diamond and its proceeds:

i)  Judgment determining the existence, perfection and validity of the Insider Priming Liens ;

j)  Judgment determining the Insider Priming Liens to the DMT Diamond proceeds junior to GE's preferred ship mortgage lien and claims to the proceeds;

k)  Judgment expunging any such lien or claim by Otto Candies to the DMT Diamond proceeds;

l)  Declaratory relief consistent with the foregoing;

m) Judgment subordinating the Insider Priming Liens to the liens and claims of GE and other creditors of DM1;

n)  An Order directing the disbursement of the proceeds of the DMT Diamond from the registry of the Court to GE;

o)  Actual damages incurred by GE for the tortuous and wrongful conduct by or attributable to Otto Candies that caused GE losses from the detention of its money and from the impairment and derogation of its collateral;

p)  An award of attorneys' fees and expenses incurred by GE in litigating this action;

q)  Costs of court; and

r)  Such other and further relief as GE may show itself entitled.

Respectfully submitted,

ADAMS AND REESE LLP


By:_____/s/ Susan C. Mathews_____
John A. Lee
State Bar No. 12125400
Susan C. Mathews
State Bar No. 05060650
Ashley E. Anderson
State Bar No. 24064814
4400 One Houston Center
1221 McKinney
Houston, TX  77010
Telephone:  (713) 652-5151
Facsimile:  (713) 652-5152


**ATTORNEYS FOR
GENERAL ELECTRIC CAPITAL
CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing has been forwarded to all parties on the attached Service List and to those parties who are registered to receive electronic notice via electronic file notification by the Clerk of the Court on this 19th day of July 2010.

*/s/ Susan C. Mathews*

Susan C. Mathews

**SERVICE LIST**

| *Counsel for Plaintiff – Deep Marine 1, LLC* | *Deep Marine Liquidating Trust* |
|---|---|
| Jason Gary Cohen<br>Bracewell & Giuliani LLP<br>711 Louisiana St, Ste 2300<br>Houston, TX 77002<br>713-221-1416<br>Fax : 713-222-3209<br>Email: jason.cohen@bgllp.com<br><br>Marcy E Kurtz<br>Bracewell & Giuliani LLP<br>711 Louisiana St, Ste 2300<br>Houston, TX 77002<br>713-221-1206<br>Fax : 713-221-2125<br>Email: marcy.kurtz@bgllp.com<br><br>William Alfred Wood, III<br>Bracewell & Giuliani LLP<br>711 Louisiana St, Ste 2300<br>Houston, TX 77002<br>713-221-1416<br>Fax : 713-221-1212<br>Email: trey.wood@bgllp.com | John Bittner, Liquidating Trustee<br>Grant Thornton LLP<br>1717 Main Street<br>Suite 1500<br>Dallas TX 75201<br>214-561-2300<br>Fax: 214-561-2370<br>Email: John.Bittner@GT.com |
| *Counsel for Defendant – Noble Denton Marine, Inc.*<br>Jeff Goebel<br>GL Noble Denton, Inc.<br>5177 Richmond Ave<br>Suite 900<br>Houston, TX 77056<br>281-657-2265<br>Fax: 713-586-7007<br>Email: jeff.goebel@nobledenton.com | *Counsel for Defendant – BNA Marine Services, LLC*<br>David W. Barry<br>Barry & Sewart, PLLC<br>4151 Southwest Freeway<br>Suite 680<br>Houston, TX 77027<br>713-722-0281<br>Fax : 713-722-9786<br>Email: bankruptcy@barryandsewart.com |

| | |
|---|---|
| ***Counsel for Defendant – Otto Candies, LLC*** <br> Thomas S Henderson, III <br> Thomas S Henderson, Attorney at Law <br> 711 Louisiana, Ste 3100 <br> Houston, TX 77002 <br> 713-227-9500 <br> Fax: 713-620-3023 <br> Email: thenderson@tsh-atty.com | ***Counsel for Defendant – B&J Martin, Inc.*** <br> Jacques P. DeGruy <br> Mouledoux, Bland, Legrand & Brackett <br> 701 Poydras St., Ste 4250 <br> New Orleans, LA 70139 <br> 504-595-3000 <br> Fax: 504-522-2121 |
| ***Defendant – NREC Power Systems, Inc.*** <br> 5222 Hwy 311 <br> Houma, LA 70360-2878 | ***Counsel for Defendant – CapRock Communications, Inc.*** <br> Edward L Rothberg <br> Hoover Slovacek, LLP <br> 5847 San Felipe, Suite 2200 <br> Houston, TX 77057 <br> 713-977-8686 <br> Fax : 713-977-5395 <br> Email: rothberg@hooverslovacek.com |
| ***Counsel for Defendant – Bollinger Shipyards Texas City, LP*** <br> Stephen Lynn Williamson <br> Montgomery Barnett et al <br> 1100 Poydras, Ste 3300 <br> New Orleans, LA 70163 <br> 504-585-3200 <br> Email: swilliamson@monbar.com | ***Counsel for Defendant – Bollinger Fourchon, LLC*** <br> Andrew T. Lilly <br> Montgomery Barnett, LLP <br> 3300 Energy Centre <br> 1100 Poydras Street <br> New Orleans, LA 70163 <br> 504-585-7637 <br> Fax: 504-200-8937 <br> Email: alilly@monbar.com <br><br> Ryan Matthew McCabe <br> Montgomery Barnett L.L.P. <br> 3300 Energy Centre <br> 1100 Poydras Street <br> New Orleans, LA 70163 <br> 504-585-7683 <br> Fax: 504-200-8983 <br> Email: rmccabe@monbar.com |

| | Stephen Lynn Williamson<br>Montgomery Barnett et al<br>1100 Poydras<br>Ste 3300<br>New Orleans, LA 70163<br>504-585-3200<br>Email: swilliamson@monbar.com |
|---|---|
| **_Counsel for Defendant – Aramark U.S. Offshore Services, LLC_**<br>Angela Sheffler Abreu<br>McCarter & English<br>Four Gateway Center<br>100 Mulberry<br>Newark, NJ 07102<br>973-848-5378<br>Email: aabreu@mccarter.com | **_Counsel for Defendant – Crossmar, Inc._**<br>Andrew T. Lilly<br>Montgomery Barnett, LLP<br>3300 Energy Centre<br>1100 Poydras Street<br>New Orleans, LA 70163<br>504-585-7637<br>Fax: 504-200-8937<br>Email: alilly@monbar.com<br><br>Ryan Matthew McCabe<br>Montgomery Barnett L.L.P.<br>3300 Energy Centre<br>1100 Poydras Street<br>New Orleans, LA 70163<br>504-585-7683<br>Fax: 504-200-8983<br>Email: rmccabe@monbar.com<br><br>Stephen Lynn Williamson<br>Montgomery Barnett et al<br>3300 Energy Centre<br>1100 Poydras<br>New Orleans, LA 70163<br>504-585-3200<br>Email: swilliamson@monbar.com |