**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In Re:** | § | |
| | § | |
| **DEEP MARINE HOLDINGS, INC.,** | § | **Case No. 09-39313** |
| **et al.** | § | |
| | § | **Jointly Administered** |
| **Debtors** | § | **Chapter 11** |

| | | |
|---|---|---|
| **THE DEEP MARINE 1, LLC** | § | |
| | § | |
| | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Adversary No. 10-03271** |
| | § | |
| **THE DEEP MARINE LIQUIDATING** | § | |
| **TRUST (AS SUCCESSOR TO DEEP** | § | |
| **MARINE TECHNOLOGY** | § | |
| **INCORPORATED, DEEP MARINE 1,** | § | |
| **LLC, DEEP MARINE 2, LLC, DEEP** | § | |
| **MARINE 3, LLC, AND DEEP MARINE 4,** | § | |
| **LLC); GENERAL ELECTRIC CAPITAL** | § | |
| **CORPORATION; NOBLE DENTON** | § | |
| **MARINE, INC.; BNA MARINE** | § | |
| **SERVICES, LLC; OTTO CANDIES, LLC;** | § | |
| **B&J MARTIN, INC.; NREC POWER** | § | |
| **SYSTEMS, INC.; CAPROCK** | § | |
| **COMMUNICATIONS, INC; BOLLINGER** | § | |
| **SHIPYARDS TEXAS CITY, LP;** | § | |
| **BOLLINGER FOUCHON, LLC;** | § | |
| **ARAMARK US OFFSHORE SERVICES,** | § | |
| **LLC; AND CROSSMAR, INC.** | § | |
| | § | |
| | § | |
| **Defendants** | § | |

**OTTO CANDIES, L.L.C.'S OPPOSITION TO**
**GENERAL ELECTRIC CAPITAL CORPORATION'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

**NOW COMES** Otto Candies, L.L.C. ("Otto Candies"), and files this opposition (along with its corresponding Exhibits A - G) to General Electric Capital Corporation's ("GE") Motion For Partial Summary Judgment and submits to the Court that the facts support Otto Candies' preferred maritime liens for reimbursement of crew wages and necessaries furnished to the M/V DMT Diamond, and that as a matter of law Otto Candies' preferred maritime liens for reimbursement of crew wages and necessaries should be paid in preference and priority to GE's preferred ship mortgage, all as more fully set forth herein.

Otto Candies first sets forth an accurate description of the facts concerning Otto Candies' relationship with the Debtors.   These facts materially contradict many unfounded allegations and conjecture included in GE's Motion for Partial Summary Judgment.   Second, Otto Candies sets forth the basis for the validity and priority of its preferred maritime lien and explains why its preferred maritime lien is superior to GE's liens.

### UNCONTROVERTED MATERIAL FACTS

**I.      Otto Candies' Relationship with the Debtors and DMT Diamond**

1.      Neither Otto Candies, III nor anyone affiliated with Otto Candies has ever served as an officer of, nor have they been involved in the day-to-day management or operations, of any of the Debtor entities.[1]

2.      Contrary to GE's allegations on page 6 of its Motion for Partial Summary Judgment, Otto Candies, Jr. never accepted the appointment of chairman nor did he serve on any advisory board as suggested by the board minutes of 2004.[2]

---

[1] *See* Declaration of Otto Candies, III (Exhibit A).

3.       Otto Candies, III first served as a director of one of the Debtors for a very short period of time (13 days) in 2008 and then again not until from July 2009.[3]  By the time Otto Candies, III became a director in July 2009, the Vessel Operating Agreement on the DMT Diamond had been in effect continuously for more than 4 years.

4.       When Otto Candies first contracted to sell the DMT Diamond (then known as the M/V Nicki Candies) to the Debtors on April 22, 2005, Otto Candies owned no stock whatsoever in any of the Debtors,[4] And, even as of this day, Otto Candies owns no stock of DM1, the owner of DMT Diamond.

5.       Contrary to GE's allegations, Otto Candies has never owned a controlling interest in the Debtors, nor was Otto Candies ever involved in the day-to-day management or operations of Debtors.  GE suggests to the Court that Otto Candies is one and the same with the Debtor by attempting to equate the day-to-day physical navigation and operation of a vessel with the management of the vessel owning company, and implying that some type of legal partnership was created by the mere use of terminology such as "strategic planning" and "partnering" when these terms were clearly used in the non-legal commercial sense.  However, there is absolutely no factual basis for GE's repeated implication that Otto Candies should be considered one and the same with the Debtors.  Further, prior to becoming a shareholder of the Debtors (over time in a series of very

---

[2]  *See* Declaration of Otto Candies, III (Exhibit A).  Even the documentation submitted by GE does not support its allegation on page 6 of its Motion for Partial Summary Judgment that "On December 16, 2004, Otto Candies, Jr. was elected to serve on an "Advisory Board" of DMT.  See GE Exhibit 5 to Bittner's affidavit (Dec 16, 2004, Board Minutes). The Board minutes simply state that "*The Board discussed the creation of an advisory Board, specifically to be considered was the Amerityre model.  Otto Candies was nominated as Chairman, **if he will accept the appointment . . .**"* [Emphasis Added]
[3] *See* Declaration of Otto Candies, III (Exhibit A).
[4] *See* Declaration of Otto Candies, III (Exhibit A).

different and unrelated transactions), the Otto Candies entities[5] and the Kazeminy entities[6] had no prior business or personal relationships.[7]

6.        Otto Candies' first substantial commercial relationship with the Debtors consummated on April 22, 2005, when Otto Candies sold the DMT Diamond to the Debtors in exchange for a $15.2 million Senior Secured Convertible Note ("SSCN").

7.        On the same date, April 22, 2005, Otto Candies entered into a Vessel Operating Agreement with the Debtors to maintain, supply and provide the "navigational" crew and operate the DMT Diamond.   Deep Marine Technology, Inc. ("DMT") was still responsible for maintaining, supplying and operating its equipment aboard the DMT Diamond, including, but not limited to the crane, the remote operating vehicle (R.O.V.), submarines and any other diving or launching equipment.[8]

8.        On October 2, 2006, Bachrach & Wood appraised the DMT Diamond at $23.5 million.[9]

9.        On November 30, 2006, GE's predecessor, National City Commercial Capital Corporation ("National City"), loaned $15 million to the Debtors while taking a preferred mortgage on the DMT Diamond.   In connection with this transaction, and at DMT's request, Otto Candies released its mortgage on the DMT Diamond, received no cash, and converted the SSCN to stock representing 22.5 percent of DMT.   At this time, Otto Candies had already been crewing and maintaining the DMT Diamond for over 1 ½ years.

---

[5]   Otto Candies, LLC.; Otto Candies, III; and Candies Shipbuilders, LLC
[6]   DCC Ventures, LLC; Triomphe Investors, LLC; NJK Holding Corporation; Nasser Kazeminy
[7]   *See* Declaration of Otto Candies, III (Exhibit A).
[8]   *See* Vessel Operating Agreement (Exhibit B).
[9]   *See* Appraisal of Bachrach & Wood (Exhibit C).

10.     It is true that in connection with this transaction Otto Candies executed a letter in favor of National City. [10]   But, in this letter, Otto Candies did only two things.

11.     First, Otto Candies affirmed that an operating agreement was in effect with respect to the DMT Diamond.   *Id.*   Thus, both National City and its successor, GE, clearly had knowledge that there was an operating agreement, and attendant preferred maritime liens, that pre-dated its mortgage.

12.     Second, Otto Candies affirmed that the ship mortgage securing the SSCN would be released.   GE alleges on Page 8 of its Motion for Partial Summary Judgment that in this letter Otto Candies "expressly and implicitly confirmed that the DMT Diamond would be free and clear of all liens at the closing on the Diamond Loan and DM1 would not be responsible for or incur future obligations for seaman's wages or cost under the Vessel Operating Agreement as of November 27, 2006."  But, in fact, there is absolutely nothing in the letter that would support this astonishing allegation.   Contrary to GE's allegations, the letter expressly states that "[t]he Operating Agreement is unaffected by and survives the termination of the [SSCN, Otto Candies' first preferred ship mortgage, and the pledge agreement]."  *Id.*   Further, GE's own vessel mortgage documentation expressly acknowledges the potential existence of preferred maritime liens.[11]

13.     With respect to the sale of other vessels to the Debtors, these were all commercial arms-length transactions that are not material to the validity of Otto Candies' preferred maritime lien on the DMT Diamond.

14.     With respect to outstanding invoices for crew wages, GE alleges on page 6 of its Motion for Partial Summary Judgment that almost immediately after entering into the

---

[10]  *See* 11/27/06 Confirmation Letter (Exhibit D).
[11]  *See* Excerpt from GE's 11/30/06 Preferred Mortgage; Section 6, pages 4-5 (Exhibit E).

Vessel Operating Agreement on the DMT Diamond, Otto Candies began accruing unpaid crewman's wages with respect to the vessel, suggesting that there was some type of nefarious scheme being carried out.  However, the records of the amounts owed to Otto Candies, which are attached to Otto Candies' Amended Proof of Claim, clearly show that only one unpaid invoice dates back to December 2006, and this one invoice had an unpaid balance of $12,299.98 on an invoice that totaled $227,960.55.[12]  In effect Otto Candies was paid $215,660.57 on this invoice.  *Id*.  The Court will clearly note that this one unpaid balance on an invoice, issued more than 1 ½ years after the operating agreement was entered into, could hardly be characterized as "immediately after" and it is clearly an anomaly, and not as GE suggests to the Court on Page 6 of its Motion for Summary Judgment  "a practice [accruing unpaid crewman's wages] that continued for almost 3 years, and [that] was only stopped in late 2006 so that the Debtors could close on the [National City loan]."  For the most part, the unpaid invoices relate to the last few months of 2007, and the years 2008 and 2009.  *Id.*

15.     The crewing of the DMT Diamond by Otto Candies allowed the Debtors to perform its contractual obligations to its customers and receive revenue.  Although Otto Candies was not paid for its crewing services, the Debtors' obligations to GE were never in "payment default" until only shortly before the bankruptcy filing.[13]  In effect, the crewing the DMT Diamond and the furnishing of necessaries to the vessel by Otto Candies without payment benefitted the Debtors and their creditors, including GE.

---

[12]  *See* Otto Candies' Amended Proof of Claim No. 3, filed 7/19/10 in Case No. 09-39315 (Exhibit F).
[13]  *See* "Exhibit A" to GE's Proof of Claim No. 8, filed in Case No. 09-39315 (Exhibit G).

16.     Vessels in dry dock and out of service for repairs still need to be crewed.[14]  But this is a factual issue as to the amount of Otto Candies' lien and not the validity of its maritime lien, which is the focus of GE's Motion for Partial Summary Judgment.

**II.     Otto Candies Possesses a Valid Preferred Maritime Lien for Both Crew Wages and Necessaries.**

17.     On April 22, 2005, Otto Candies entered into a Vessel Operating Agreement with Deep Marine 1, LLC ("DM1")/DMT to crew and maintain the DMT Diamond.[15]

18.     Beginning in April 2005, and pursuant to the terms of the Vessel Operating Agreement, Otto Candies crewed, maintained and supplied the DMT Diamond with necessaries.[16]

19.     Otto Candies was paid for the crewing and services provided to DMT on a regular basis until the latter part of 2007.[17]

20.     Beginning in November 2007, while Otto Candies continued to submit invoices for services provided to the DMT Diamond, the invoices went unpaid.[18]

21.     By November 2009, Otto Candies was owed $3,275,928.49 for crew wages and benefits and $1,415,711.40 for insurance, repairs, maintenance and other expenses in connection with the DMT Diamond.[19]

22.     On December 4, 2009, the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code.

---

[14] *See* Declaration of Otto Candies, III (Exhibit A).
[15] *See* Vessel Operating Agreement (Exhibit B).
[16] *See* Vessel Operating Agreement (Exhibit B).
[17] *See* Otto Candies' Amended Proof of Claim No. 3, filed 7/19/10 in Case No. 09-39315 (Exhibit F).
[18] *See* Otto Candies' Amended Proof of Claim No. 3, filed 7/19/10 in Case No. 09-39315 (Exhibit F).
[19] *See* Otto Candies' Amended Proof of Claim No. 3, filed 7/19/10 in Case No. 09-39315 (Exhibit F).

7

23.     On February 19, 2010, Otto Candies filed its Proof of Claim in the DM1 bankruptcy asserting its preferred maritime lien against the DMT Diamond for the sum of $5,668,890.54, which included its claim for reimbursement of crew wages and benefits in the amount of $3,275,928.49, and reimbursement for insurance, repairs, maintenance and other expenses and overhead in connection with the operation of DMT Diamond in the amount of $1,415,711.40, along with interest due, pursuant to the terms of the Vessel Operating Agreement, through December 3, 2009 in the amount of $977,250.65.[20]

24.     On July 19, 2010, Otto Candies filed an amended Proof of Claim in the DM1 bankruptcy, delineating between the amount paid for crew wages and benefits and the amount paid for insurance, repairs, maintenance, other expenses and overhead incurred in connection with the operation of DMT Diamond and setting forth the amount claimed in interest, on which amounts Otto Candies claimed preferred maritime lien status.[21]

25.     With respect to the reimbursement for crew wages and benefits as well as its payment of necessaries as set forth in the preceding paragraphs, Otto Candies respectfully submits that 46 U.S.C. § 31326(b)(1) entitles it to claim a preferred maritime lien that should be paid in preference and priority to GE's preferred mortgage lien.

26.     46 U.S.C. § 31326(b)(1) provides that a preferred mortgage lien has priority over all claims against the vessel _except_ for expenses and fees allowed by the court, costs imposed by the court, and _preferred maritime liens_.

---

[20] _See_ Otto Candies' Amended Proof of Claim No. 3, filed 7/19/10 in Case No. 09-39315 (Exhibit F).
[21] In its Answer and Amended Cross Claim to the Amended Complaint to Interplead Funds, Otto Candies did not allege a preferred maritime lien with respect to the necessaries at that time, but it is clear that this intent is set forth in the Proof of Claim and the Notice pursuant to 11 U.S.C. 546(b). Subsequent legal research confirms its view that the law affords Otto Candies a preferred lien status on its maritime liens for necessaries that pre-date GE's preferred ship mortgage. Otto Candies had informed GE of its position and intends to amend its Answer and Cross Claim to conform to its legal right to assert a preferred maritime lien for necessaries.

27.     Under 46 U.S.C. § 31301(5) (D), the definition of a "preferred maritime lien" includes a maritime lien on a vessel for wages of the crew of the vessel.

28.     Under 46 U.S.C. § 31301(5) (A), the definition of a "preferred maritime lien" also includes a maritime lien on a vessel arising before a preferred mortgage is filed under section 31321 of this title.

29.     With respect to wage liens, they are given priority over a preferred ship mortgage "generally because these liens must be favored to ensure that the vessel is kept moving in trade . . . [and such priority] serves indirectly to protect the mortgagee's interests because the mortgagee wants the vessel to operate."  *See Governor and Co. of Bank of Scot. v. Sabay*, 211 F.3d 261, 270-71 (5th Cir. 2000) (quoting from In *Kopac Int'l, Inc. v. M/V Bold Venture*, 638 F. Supp. 87, 90 (W.D. Wash. 1986)).

30.      Additionally, maritime law provides that "[a]ny person advancing money to a ship on the order of the master or one [e]ntrusted with her management and for the purpose of satisfying outstanding or future lien claims against the vessel is entitled to a lien of equal dignity with the one replaced, provided the amounts so advanced are actually applied to the payment of such debts."  *Tramp Oil and Marine, Ltd. v. M/V MERMAID I*, 805 F.2d 42, 45 (1st Cir. 1986).

31.     This rule is equally applicable to crew wages, and therefore one who pays the crew wages is entitled to a maritime lien of the same rank.  *See Int'l Paint Co., Inc. v. M/V Mission Viking*, 637 F.2d 382, 385-86 (5th Cir. Unit B 1981); *see also Bank of New Orleans & Trust Co. v. Oil Screw Tracy Marie*, 455 F. Supp. 78, 79-80 (W.D. La. 1978); *P. T. Perusahaan Pelayaran Samudera Trikora Lloyd v. T. S. Salzachtal*, 373 F. Supp. 267 (E.D.N.Y. 1974); *Reconstruction Fin. Corp. v. The William D. Mangold*, 99 F. Supp.

651, 652-53 (E.D.N.Y. 1951); *United States v. Jersey-American S.S. Co. (In re The Englewood)*, 57 F.2d 319, 320 (E.D.N.Y. 1932).

32.     With respect to those expenses incurred by Otto Candies other than for crew wages and benefits, its is respectfully submitted that these expenses were necessaries furnished to the DMT Diamond pursuant to a Vessel Operating Agreement dated April 22, 2005.

33.     As discussed in *Bank One, Louisiana N.A. v. Mr. Dean M/V*, 293 F.3d 830 (5th Cir. 2002), a maritime lien attaches as of the commencement of the undertaking, and any subsequent breach for non payment for services relates back to that time.  This is the current law of the Fifth Circuit.  GE's reliance on the 1979 decision of *Riffe Petroleum Co. v. Cibro Sales Corp.,* 601 F.2d 1385, rendered by the Tenth Circuit is misplaced, as this decision  is neither controlling nor on point.

 34.     The Court should view the validity of Otto Candies' lien for both crew wages and necessaries as of the date the lien attached, which was April 22, 2005.  At that point in time, Otto Candies was not a shareholder of any of the Debtors, and therefore any suggestion by GE as to Otto Candies' ownership of any stock at some later date should not be material to the validity of the preferred maritime liens.

35.     Based on the law of the Fifth Circuit, Otto Candies' maritime lien for necessaries existed as of April 22, 2005, and therefore its maritime lien pre-dates GE's preferred ship mortgage.  As such, Otto Candies' claim for necessaries constitutes a preferred maritime lien that must be paid in preference and priority to GE's preferred ship mortgage.

36.     A presumption also arises under maritime law that a party furnishing supplies or other qualifying services to a vessel acquires a maritime lien, "and parties, such as GE, attacking this presumption have the burden of establishing that the personal credit of the owner or charterer was solely relied upon." *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 605 (5th Cir. 1986).

37.     Generally, the only exception to the maritime law of advances is that the owner of the vessel cannot acquire a maritime lien against its own vessel.  This exception also applies to those who enter into a joint venture with the owner of the vessel and, in very limited situations, to a shareholder when the shareholder is actively engaged in the management and control of the vessel owner's affairs.

38.     GE takes this traditional maritime exception regarding the ownership and joint ventures, and attempts to indiscriminately apply it to any party that is a shareholder. This issue was clearly addressed more than 80 years ago in *The Gloucester*, 285 F. 579, 581-82 (D. Mass. 1923).   In *Gloucester,* the court found that the fact that a corporation furnishing supplies to a vessel and the corporation owning the vessel had largely the same stockholders and many of their officers were identical did not make the supply company a part owner of the vessel.  In the *Gloucester,* the court found that the supply company had a valid lien, because the managing officers of the two corporations were different and there was no showing that the supply corporation used its relationship to compel the vessel to purchase supplies from it.

39.     The mere fact that the party claiming the maritime lien also has an exclusive working relationship with the vessel does not invalidate that party's lien, nor does the fact

that a party owns stock in the vessel-owning corporation, in and of itself, preclude that party from asserting a maritime lien against the vessel.

40.     GE cites *Sasportes v. M/V Sol De Copacabana,* 581 F.2d 1204 (5th Cir. 1978), for the proposition that an "owner, part-owner or joint venturer cannot hold a maritime lien." Otto Candies has no dispute with this contention.  In fact, Otto Candies submits that the Fifth Circuit's analysis of the facts in *Sasportes* actually supports the validity of Otto Candies' maritime lien in the case at bar.

41.     In *Sasportes,* the Fifth Circuit held that when a company does not participate in a vessel's profits in any important sense and does not exert any significant control over the vessel beyond that which any creditor or contract obligee might have, it should not be considered to be in a joint venture with the owner, and therefore should not lose its maritime lien status.  *Id.* at 1208-09.

42.     In *Sasportes*, Star Kist had an exclusive agreement with the vessel owner in which Star Kist was required to buy, and the vessel owner was required to sell, the vessel's entire catch at a price specified in the contract.  *Id*. at 1207-08.  The mortgagee seized the vessel, and Star Kist asserted a maritime lien for advances made to the vessel for necessaries.  *Id*. at 1206-07.  The district court found that a joint venture existed between Star Kist and the vessel owner, and therefore the district court denied Star Kist's maritime lien status for advances that Star Kist had made.  *Id*. at 1207.

43.     Despite the fact that a relationship between Star Kist and the vessel owner had existed for some time and involved quite frequent dealings, and that Star Kist had advanced funds to the vessel owner for purposes other than necessaries of the vessel, the Fifth Circuit found on appeal that Star Kist exerted "no significant control over the

[vessel owner] beyond that which any creditor and contract obligee might have." *Id.* at 1209.  Therefore, neither the common interest nor exclusive relationship were sufficient to preclude Star Kist from asserting a maritime lien for the advances it made for crew wages and other necessaries. *Id*. at 1207-09.

44.     As mentioned, a party that owns stock in the vessel-owning corporation is only prohibited from asserting a maritime lien when there is an element of direct control or active management by that shareholder in the affairs of the vessel-owning corporation or where the identities of the two are inseparable. *See The Gloucester*, 285 F. 579, 581-82 (D. Mass. 1923); *The Puritan*, 258 F. 271 (D. Mass. 1919).

45.     GE cites the district court decision rendered in the case *In re SeaEscape,* 191 B.R. 944 (S.D. Fla 1995) for the proposition that shareholders are *per se* precluded from having a lien on vessel.  However, a careful reading of the opinion will reveal the court found more than the fact of stock ownership.  The facts revealed an extensive inter-relationship between the lien holder and vessel owner.  In *SeaEscape,* the key witness, who was President of both entities, described himself as "interchangeable."

46.      Even the case cited by the *SeaEscape* court for support of the invalidity of maritime liens held by shareholders, *The Odysseus III,* 77 F. Supp. 297, (S.D. Fla 1948), involved more than mere stock ownership.  In *The Odysseus III,* the court denied lien status because the shareholders were also the directors and officers of the corporation, as well as the master and mate of the vessel; clear *indicia* of management and control.

47.     With respect to GE's contention that DMT Diamond was a "dead ship," this issue is essentially a "dead issue" subsequent to the definition of a "vessel" rendered in the 2005 decision of the United States Supreme Court in *Stewart v. Dutra Construction*, 543

U.S. at 492, 497, 125 S.Ct. 1118.  In *Stewart*, the Supreme Court concluded that a large floating dredge with little ability to move on its own qualified as a "vessel" pursuant to 1 U.S.C. § 3, which sets forth the "established meaning [of the term vessel] in general maritime law." Although permanent withdrawal will prevent a ship from being deemed a vessel, a ship's "primary purpose or state of transit at a particular moment" does not control the ship's "vessel" status; rather, a watercraft need only be "used or capable of being used" as a means of transportation on water to avoid being a dead ship. *Id.* at 495, 497, 125 S.Ct. 1118.  Consequently, subsequent to the extremely broad definition of a vessel advanced by the Supreme Court, the only vessel that would likely be considered a "dead ship" would be a vessel that was in the process of being dismantled.

48.     With respect to GE's contention that Otto Candies should be estopped for asserting a maritime lien because Otto Candies allowed the wages and costs to accrue without making any effort to collect the debt, GE has presented no evidence that Otto Candies made no effort to collect its debt.  As is evidenced by the declaration of Otto Candies, III, Otto Candies did make continuous and ongoing efforts to have its invoices paid. [22]

49.     GE complains that Otto Candies made no disclosure to GE of its unpaid invoices to the Debtor.  Clearly, Otto Candies was not a party to any contract with GE and had no obligation, contractual or otherwise, to disclose any information to GE.    But notwithstanding this fact, GE cannot claim ignorance.  GE clearly had knowledge, or should have had knowledge, of the debt, as GE was entitled to receive regular financial information on the Debtors including the sums owed by the Debtors.

---

[22] *See* Declaration of Otto Candies, III (Exhibit A).

50.     The fact of the matter is Otto Candies' liens would have primed GE's liens regardless, and Otto Candies did not place itself in any better position by any actions it took or didn't take.    However, if mere knowledge of the Debtor's poor financial condition and failure to take action because of this knowledge is a basis for avoiding preferred lien status, then the Court should likewise subordinate and/or invalidate GE's preferred maritime lien as well, which is exactly what the court did with respect to the mortgagee in the case of *Cantieri Navali Riuniti v. M/V Skyptron,* 621 F. Supp. 171, 187 (W.D. La 1985); a case cited by GE for authority to invalidate or subordinate Otto Candies' lien.

51.     In *Skyptron,* the court held that the mortgagee was familiar with and monitored the financial problems of the vessel owner, and allowed the vessel owner to continue to run up debts.   Under the provisions of the mortgage, the mortgagee could have taken possession of the vessel, but chose instead to allow the vessel to continue to slip further into debt at the expense of other lien holders.    Based on these findings, the district court subordinated the claims of the mortgagee to those of the other maritime lien claimants.

52.     In the case at bar, GE (1) knew of the Vessel Operating Agreement with Otto Candies for the crewing and provisioning of the DMT Diamond, (2) monitored and knew, or should have known, the financial problems of the Debtors, (3) knew that liens were accruing on the vessel, and (4) could have taken possession of the vessel under the terms of the mortgage, but instead chose to allow the Debtors to continue to slip further in debt, at the expense of creditors such as Otto Candies.   Under these circumstances, like the mortgagee in *Skyptron,* GE's lien should be subordinated to claims of the other maritime lien holders.

53.     The reality of the situation is that there are essentially only two lien holders remaining in this interpleader.  They are Otto Candies and GE, and GE certainly had as much, if not more, knowledge of the Debtors' financial condition as Otto Candies had. The difference between GE and Otto Candies is that GE continued to get paid as it sat on the sidelines and watched the DMT Diamond continue to operate and generate revenues at Otto Candies' expense.

54.     GE cites *In re* S*eaEscape* for the proposition that a party who allows the vessel's debts to build up over time will be denied a lien, and that a lien claimant's action in "permitting the arrearage of such magnitude to accrue was improvident," and therefore the lien claimant should be estopped from asserting its lien due to its failure to promptly enforce its liens.  *In re SeaEscape,* 191 B.R. at 948.    Relying on this Florida district court decision in *SeaEscape,* GE suggests that Otto Candies' delay in bringing claim against the Debtors was likewise improvident.  But this 'improvident' standard as set forth in the *SeaEscape* decision is not only <u>not</u> the law of the Fifth Circuit, it is not the law with respect to maritime liens in any circuit.

55.     *SeasEscape, supra*, cites two maritime cases as authority for this position; *Tagaropulos, S.A. v. S.S. Santa Paula,* 502 F.2d 1171 (9th Cir. 1974), and  *Gulf Oil Trading Co. v. Creole Supply*, 596 F.2d 515 (2nd Cir. 1979),   However, neither case stands for the proposition for which they were cited in *SeaEscape.  Tagaropulos* involved a maritime lien claimant that sought to enforce its lien against a vessel after the vessel had been purchased by a bone fide purchaser,  In *Tagaropulos,* the court held that the maritime lien was barred by *laches* - not because of delay in and of itself, but because the bona fide purchaser was prejudiced by the lien holder's delay in bringing its claim.  *Gulf*

*Oil Trading Co.* likewise does not support the propositions advanced in *SeaEscape*.   In *Gulf Oil Trading Co.,* the court precluded the enforcement of a maritime lien, not because of delay in bringing the claim; but rather because the attempt by the maritime claimant to enforce the lien came after a vessel foreclosure proceeding. The court found that the claimant's inchoate maritime lien, like any other maritime lien, was wiped out by the foreclosure, *supra* at 522.

56.     Otto Candies submits that mere delay alone, no matter how long the delay,  is not the standard of the Fifth Circuit in deciding the validity of a maritime lien.  Rather the standard is "*laches.*"  This distinction is evident in the Fifth Circuit decision in *Pascagoula Dock Station v. Merchants and Marine Bank,* 271 F.2d 53 (5th Cir. 1959), in which the district court initially found that there was delay, but no *laches,* and therefore subordinated the claim of the preferred maritime lien to that of the preferred ship mortgage.  In reversing the district's ruling in *Pascagoula,* the Fifth Circuit stated:

> We here deal with questions of the validity of a preferred ship mortgage, 46 U.S.C.A. § 922, on the fishing vessel M/V T. E. Welles and the correctness of the Trial Judge's action in holding that the preferred ship mortgage to the Bank outranked a prior maritime lien in favor of Pascagoula Dock Station.
>
> . . . .
>
> But the case stands much differently as to the pre-mortgage maritime lien (totaling $1,282.12) included within Pascagoula's maritime lien fixed by the Court ($1,883.95). The District Court allowed the lien, so he did not hold that the lien was unenforceable, as such. Rather he held that the whole lien ($1,883.95) 'is subject to and subordinate to the preferred lien of the * * * Bank' and the pre-mortgage lien ($1,282.12) 'is hereby found to be subordinate to the * * * preferred lien of the bank * * *.' Just how or why the District Judge held as he did does not at first appear. And where reasons are given, difficulties arise because some seem to be patently contradictory.
>
> The Bank pleaded laches against Pascagoula and asserted that vigorously below and here. But the Trial Court, both in a detailed oral opinion

delivered on the close of the extended arguments, and in its formal findings and decree, expressly rejected the doctrine of laches. Yet within but a few lines after the formal finding respecting the pre-mortgage lien that Pascagoula was 'not guilty of laches' the Court holds the lien subordinate to the mortgage 'by reasons of (1) delay on the part of libelants (Pascagoula) and (2) lack of knowledge of the * * * Bank, it being found that the Bank had no knowledge of such at the time of mortgage.'

We cannot escape the conviction that while some possible analysis of these contradictions might be suggested to seem finally to harmonize them, the conclusions expressed by this careful Judge were a reflection of a basic misconception of the nature of the maritime lien in a priority contest with a preferred mortgage. The Court several times expressed the view that ignorance by the Bank of Pascagoula's existing liens gave the mortgage priority. The Bank acknowledged before us that this is not, and cannot be, the law. But this notion seemed to infect the conflicting conclusions that (a) Pascagoula was not guilty of laches but that (b) the maritime lien lost priority because of delay.

The Bank with persuasive earnestness justifies the result on the ground that despite the Judge's disclaimer, repeated not less than three times, the findings were the equivalent of laches. And in anticipation of the almost certain reaction that we would be reluctant to rest affirmance on an implied finding of laches which the Judge expressly negated, the Bank asserts that here the result would be eminently fair. That is based on the further assertion that operation of the ancient Mississippi Maritime Lien Statute with its internal 6-months' limitation period, invokes the usual rule on laches analogous to state limitations to thus impose on the dilatory one the burden of establishing a reasonable excuse and disproving harm to the other.

We cannot do this as it assumes the very point in question: Did the Judge mean delay only or laches as that term is ordinarily understood? The legal consequences in terms of actual priority or subordination of maritime lien versus preferred mortgage turn on this factlegal (sic) conclusion.

Some consequences are clear. For instance, if on the remand which we order the Judge adheres to his conclusion that there was delay but no laches, then the decree to be entered must be in favor of the maritime lien ($1,282.12) as superior to the mortgage. Section 953(b), (46 U.S.C.A. § 953) expressly accords priority to 'preferred maritime liens' which this would then be since it would be unaffected by laches (46 U.S.C.A. § 974(2)) found not to exist, *Pascagoula Dock Station, supra.*

57.     The doctrine of *laches* is an affirmative defense barring assertion of a lien when an unreasonable delay occurred in asserting the lien <u>and</u> prejudice resulted from that delay, *Tagaropulos, supra*   Where the lien is enforced  and the owner of the vessel at the time of enforcement was also the owner at the time the lien accrued, then delay is not subject to the same scrutiny as when the lien is sought to be enforced against,  and is to the detriment of, a bona fide purchaser, without notice of the lien,  *Bermuda Exp., N.V. v. M/V Litsa (Ex. Laurie U),* 872 F.2d 554 (3 Cir. 1989).

58.     Otto Candies' crewing of the DMT Diamond allowed the Debtors to perform their contractual obligations to their customers and receive revenue.  Otto Candies was not paid for much of its crewing and maintenance services, and derived no benefit from the Debtors' delay in paying their obligations.   However, the Debtors' obligations to GE were never in "payment default" until only shortly before the bankruptcy filing.  In effect, the crewing and furnishing necessaries by Otto Candies without payment benefitted the Debtors and their creditors, including GE – but not Otto Candies.

59.     Otto Candies neither managed nor controlled DMT, or DM1.  Nor was Otto Candies at anytime a majority shareholder of any Debtor.   In fact, as previously mentioned, at the time when the initial Vessel Operating Agreement was executed, Otto Candies owned no stock of any Debtor.

60.     In summary, pursuant to the terms of the Vessel Operating Agreement, Otto Candies crewed and maintained the DMT Diamond.  Having paid the salaries of the crew working aboard the DMT Diamond, and having paid for other necessaries pursuant to a Vessel Operating Agreement that pre-dated GE's preferred ship mortgage, Otto Candies

is entitled to assert a lien for crew wages and necessaries and to be paid in preference and priority to GE's preferred ship mortgage.

WHEREFORE, premises considered, Otto Candies respectfully requests that the Court deny GE's Motion for Partial Summary Judgment, and find that

(1)     As a matter of law, the mere ownership of stock in a company that owns a vessel does not *per se* preclude a shareholder from having a valid maritime lien against the vessel;

(2)     As a matter of law, the validity of Otto Candies' preferred maritime liens is determined at the time the maritime liens attach;

(3)     Otto Candies' maritime liens attached as of the date of the Vessel Operating Agreement, pursuant to the law of the Fifth Circuit as set forth in *Bank One, Louisiana N.A. v. Mr. Dean M/V*, 293 F.3d 830;

(4)     Otto Candies neither managed nor controlled any of the Debtors;

(5)     Otto Candies has a valid preferred maritime lien for reimbursement of crew wages and benefits;

(6)     Otto Candies has a valid preferred maritime lien for necessaries pursuant to a Vessel Operating Agreement that pre-dates the filing of GE's preferred ship mortgage; and

(7)     Otto Candies should not be estopped from asserting its maritime lien any more that GE should be estopped.

Respectfully submitted,

By: ___/s/ *David L. Carrigee*_____
David L. Carrigee (La. Bar No. 3892)
Karl J. Zimmermann (La. Bar No. 14481)
Jena W. Smith (La. Bar No. 25255)
**BALDWIN HASPEL BURKE & MAYER, LLC**
Energy Centre - 22nd Floor
1100 Poydras Street, Suite 2200
New Orleans, Louisiana  70163
Telephone:     504.569.2900
Facsimile:     504.569.2099

– AND –

Thomas S. Henderson (TBA No. 09432300)
South Tower, Pennzoil Place
711 Louisiana Street, Suite 3100
Houston, Texas 77002-2716
Telephone:     713.227.9500
Facsimile:     713.620-3023

**COUNSEL FOR OTTO CANDIES, L.L.C.**

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a copy of the above and foregoing pleading has been

served electronically upon all counsel of record subscribed to the Court's CM/ECF

system in this Adversary Proceeding on this  27th day of January, 2011.

_____/s/ *David L. Carrigee*_____

B0430805.2