## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| **DEEP MARINE HOLDINGS, INC.,** | § | **Case No. 09-39313** |
| **Et al.** | § | |
| | § | **Jointly Administered** |
| Debtors. | § | **Chapter 11** |

---

| | | |
|---|---|---|
| **DEEP MARINE 1, LLC** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 10-03271** |
| | § | |
| **THE DEEP MARINE LIQUIDATING** | § | |
| **TRUST (AS SUCCESSOR TO DEEP** | § | |
| **MARINE TECHNOLOGY** | § | |
| **INCORPORATED, DEEP MARINE** | § | |
| **HOLDINGS, INC., DEEP MARINE 1,** | § | |
| **LLC, DEEP MARINE 2, LLC, DEEP** | § | |
| **MARINE 3, LLC, AND DEEP MARINE** | § | |
| **4, LLC), ET AL.** | § | |
| | § | |
| Defendants. | § | |

## GENERAL ELECTRIC CAPITAL CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST OTTO CANDIES, LLC

General Electric Capital Corporation ("GE") files this Motion for Partial Summary Judgment against Otto Candies, LLC ("Otto Candies") seeking a Judgment from this Court on Count I and II of its Cross-Claim invalidating the alleged maritime lien asserted by Otto Candies in this matter and, in support thereof, states as follows:

## INTRODUCTION

As of December 4, 2009 ("Petition Date"), GE was owed in excess of $13 million by Deep Marine 1, LLC ("DM1") which was secured by a preferred ship mortgage dated November 30, 2006, on the DMT Diamond owned by DM1.

On February 19, 2010, Otto Candies filed a notice pursuant to 11 U.S.C. § 546(b) and proof of claim alleging it held a preferred maritime lien against the DMT Diamond for an amount in excess of $5.6 million. Otto Candies based its alleged lien on crew wages and costs it purportedly paid to operate the DMT Diamond pursuant to a Vessel Operating Agreement dated April 22, 2005, executed by Otto Candies and Deep Marine Technology, Inc. ("DMT"), who was at that time the parent corporation of DM1.[1]

Otto Candies claims its alleged preferred maritime lien for crew wages is senior in priority to GE's first preferred ship mortgage on the proceeds from the sale of the DMT Diamond under admiralty law. GE disputes the nature, extent, validity and priority of Otto Candies' alleged lien and is seeking summary judgment on these issues for two reasons. Under controlling Fifth Circuit maritime law, an owner or part-owner of a vessel cannot hold a maritime lien against its own vessel. A stockholder in a company owning a vessel has been conclusively held to be a part-owner of the vessel. Otto Candies has been the second largest shareholder of the Debtors since 2006 and has been intimately involved in the Debtors' business operations since 2004. Otto Candies' influence and control as a shareholder is demonstrated by the fact the Debtors purchased

---

[1] Otto Candies has admitted that its alleged preferred maritime lien for crew wages was approximately $3.9 million as of the Petition Date and the approximate $1.7 million balance of its lien claim was for "necessaries" which is junior to a preferred ship mortgage. *See* Answer and Amended Cross-Claim of Otto Candies, L.L.C., to the Amended Complaint to Interplead Funds, Etc., Filed by Deep Marine 1, LLC at 6-7. This Motion only addresses the alleged preferred maritime lien for crew wages, and GE reserves it right to file a motion for partial summary judgment on the alleged lien for "necessaries."

their principal assets (four vessels) from Otto Candies, and these vessels were all operated by Otto Candies.   Otto Candies' alleged preferred maritime lien is simply an attempt by a part-owner to assert a lien against its own vessel, and is, therefore, invalid under applicable maritime law.

Second, a party who allows the vessel's debts to "build" will be estopped from asserting a lien.   Otto Candies allowed the debts of the DMT Diamond to accrue, beginning in December 2006, to an amount in excess of $5.6 million, without making any effort to either collect or disclose the debt or the alleged claim of lien to GE or other parties engaged in transactions with the Debtors.   Based upon its shareholder status and contractual relationship with the Debtors, Otto Candies was not a "stranger" to the vessel for whom maritime liens are designed to protect.   Thus, Otto Candies is estopped from asserting a preferred maritime lien at this late date.

In the alternative, and only if Otto Candies is successful in showing that it was not a part-owner of the vessel, was not an investor in the Debtors (hereinafter defined), was a stranger to the vessel, and did not allow the lien to accrue to such a magnitude that it is estopped from asserting a preferred maritime lien now (which Otto Candies cannot show), GE asserts that Otto Candies' alleged lien should be limited to wage claims and costs accruing prior to October 19, 2009 based on the "dead ship" doctrine.

GE's Motion for Summary Judgment is supported by (i) the Affidavit of Dale Shores of GE Capital Corporation ("Shores Affidavit" attached hereto as Exhibit "D"), (ii) the Affidavit of John Bittner, the Liquidating Trustee of the Deep Marine Liquidating Trust ("Bittner Affidavit" attached hereto as Exhibit "M"), (iii) Otto Candies' Responses to GE's Rule 2004 Request for Production of Documents, (iv) pleadings and exhibits

filed by Otto Candies in the main bankruptcy cases and related cases, and (v) documents produced and pleadings filed by the Debtors and Liquidating Trustee.

BACKGROUND FACTS

**1.    Nasser Kazeminy/DCC Ventures' Relationship to Debtors**

DMT was incorporated as a Texas corporation in 2001.[2]  Its primary business at that time was providing subsea inspection, maintenance and repair services, and light construction capabilities to the oil and gas industry in the Gulf of Mexico.[3]  In 2002, Paul McKim, DMT's president, sought and obtained financing from Nasser Kazeminy ("Kazeminy") and his company DCC Ventures, LLC[4] in exchange for an equity interest in favor of DCC in DMT.  DCC Ventures later purchased the majority of another shareholder's interest in DMT and, by June 2004, was the largest shareholder of DMT holding 49.12% of the company's outstanding common stock.[5]  In October 2004, Kazeminy was elected to the Board.

**2.    Otto Candies' Relationship with the Debtors**

DMT's business gradually expanded to providing customers with vessels equipped with remote-operated vehicles ("ROVs").  Otto Candies was in the marine transportation business and owned and operated vessels.[6]  In 2004, DMT began chartering vessels from Otto Candies pursuant to a Blanket Time Charter Agreement.[7]

---

[2]    *See* Texas Secretary of State Certificate of Incorporation (Ex. "A").

[3]    *See* Notes to Projected Financial Statements attached to DMT Board of Directors' Meeting Agenda for July 18, 2006 meeting (Bates-stamped doc. No. NJK000595, 000616-000620 (Ex. "B").

[4]    *See* Timeline regarding involvement of Kazeminy in DMH and DMT (Defendants' Exhibits in connection with October 18, 2010 hearing on Motion to Dismiss Complaint) (Ex. "C").

[5]    *See* DMT Minutes of October 26, 2004 Special Shareholders' Meeting (Ex. "1" to Ex. "D," Bittner Affid.).

[6]    *See* Otto Candies Depo. at 13 (Ex. "E").

[7]    *See* Blanket Time Charter Agreement dated August 25, 2004, attached to Liquidating Trustee's Response to Motion to Dismiss, filed in Adv. No. 10-3312 (Ex. "JJ" to Mark Mathies Affid.) (Ex. "F").

The first vessel was the "Mother Theresa."[8]  Otto Candies' relationship with DMT was more than simply a vendor providing vessels to a customer.  In fact, McKim described Otto Candies as a "strategic partner" in a letter sent to shareholders of DMT in the fall of 2004, stating as follows:

> Key to our ongoing efforts has been our agreement with Otto Candies, Inc., one of the premier boat companies in the Gulf and around the world. Our agreement calls for Otto Candies to sell DMT a $14 million vessel in exchange for a three year non recourse, convertible note.  The interest on the note would not be paid till the third year where Otto Candies would either convert the note or recall the vessel.  DMT would have the option of purchasing the vessel.  If Otto Candies converts, it would be for between 22% and 25%, depending on the dilution from our $11 to $15 million round.  In addition, Otto Candies, Inc. will provide management and crew for the vessel.  <u>We are all very excited about this strategic partnering</u> which will also open doors to additional work in the Gulf and around the world.[9]

On December 8, 2004, DMT and Otto Candies executed a Term Sheet ("Term Sheet") for the purchase of the DMT Vessel as described in McKim's earlier letter.[10]  The parties agreed as follows:

a.   DMT would form a wholly owned special purpose entity to acquire the vessel;

b.   The sale was to be financed by a $15.2 million loan ("Candies Loan") made by Otto Candies to DM1 pursuant to a convertible note loan.

c.   The loan was to be secured by a first preferred ship mortgage on the DMT Diamond.

d.   The convertible note could be converted by Otto Candies into shares of common stock of DMT based on terms and conditions related to anniversary dates of the Candies loan.

e.   Otto Candies would "provide its assistance on a non-exclusive basis in providing introductions and business contacts to DMT with a view to enhancing the business ...."

---

[8]   *See Id.*
[9]   *See* October 15, 2004 Letter to Shareholders (Ex. "2" to Bittner Affid.) (emphasis added).
[10]   *See* Term Sheet dated December 8, 2004 (Ex. "3" to Bittner Affid.).

   f.    At closing DMT would enter into a separate Vessel Operating Agreement wherein Otto Candies was to be paid on a day rate basis to "manage the operations of the Ship, crew and maintenance."[11]

On December 16, 2004, Otto Candies, Jr. was elected to serve on an "Advisory Board" of DMT, and the Board approved DMT's purchase of the DMT Diamond from Otto Candies.[12]

Pursuant to the Term Sheet, DMT formed DM1 as a Louisiana limited liability company in March, 2005.[13]

On April 22, 2005, Otto Candies and DM1 closed on the purchase of the vessel financed by Otto Candies, and DM1 executed (i) a senior secured convertible note ("Candies Note")[14] in the original principal amount of $15,200,000 payable to the order of Otto Candies, and (ii) a first preferred ship mortgage ("Candies Mortgage") for the benefit of Otto Candies.[15]

Despite the fact that it already held a preferred ship mortgage on the DMT Diamond, Otto Candies almost immediately began accruing unpaid crewman's wages with respect to the vessel, which were allegedly due by DMT under the Vessel Operating Agreement.[16]   This practice continued for almost three years, and was only briefly

---

[11]   *See* "Vessel Operating Agreement" dated April 22, 2005 (Ex. "4" to Bittner Affid.).
[12]   *See* December 16, 2004 Minutes (Ex. "5" to Bittner Affid.).
[13]   *See* Louisiana Secretary of State Certificate regarding formation of DM1 (Ex. "G").
[14]   *See* Candies Note (attached to Otto Candies' Response to Request No. 3 of GE's Rule 2004 Request for Production) (Ex. "H").
[15]   *See* Candies Mortgage (attached to Otto Candies' Response to Request No. 3 of GE's Rule 2004 Request for Production) (Ex. "I").
[16]   *See* Otto Candies' Amended Proof of Claim No. 8 dated July 19, 2010, filed in Case No. 09-39315 (Ex. "K").

stopped in late 2006 so that the Debtors could close on the Diamond Loan as described below.[17]

### 3.    National City Loan to DM1

In the Spring of 2006, DMT began to explore long-term financing to fund its expanded operations.[18]  DMT approached National City Commercial Capital Corporation ("National City") for a working capital loan which was to be collateralized by the DMT Diamond.[19]

In order to obtain the financing from National City it was necessary for Otto Candies to release its lien on the vessel (*i.e.*, the Candies Mortgage).  On November 27, 2006, Otto Candies (i) exercised the conversion option and converted the Candies Note into 11,558 shares of common stock pursuant to an agreement executed by the parties on September 18, 2006, and (ii) executed a Release of Mortgage on the DMT Diamond.[20]

On November 30, 2006, National City made a $15 million loan ("Diamond Loan") to DM1 pursuant to a Loan Agreement dated the same day ("Diamond Loan Agreement"), executed by DM1 and National City.[21]

The Diamond Loan is evidenced by a Secured Promissory Note ("Diamond Note") also dated November 30, 2006, in the original principal amount of $15 million, executed by DM1, as maker, payable to the order of National City, as holder.[22]

The Diamond Note was secured by, among other things, a United States first priority Preferred Mortgage and Deed of Covenants ("Diamond Mortgage").[23]

---

[17]   *See* A/P Aging Summary attached to DMT Board of Directors' Meeting Agenda for November 7, 2006 Meeting (Bates-stamped doc. nos. NJK000849-000884) (Ex. "J").

[18]   *See* April 6, 2006 Board of Director Meeting Minutes (Ex. "6" to Bittner Affid.).

[19]   Document No. 9 to DMT Board of Directors' Meeting Agenda for July 16, 2006 (Bates-stamped Doc. No. NJK000620) (Ex. "B").

[20]   *See* November 27, 2006, Agreement and Release of Mortgage (Ex. "L").

[21]   *See* Diamond Loan Agreement (Ex. "1" to (Ex. "M") Shores Affid.).

[22]   *See* Diamond Note (Ex. "2" to Shores Affid.).

Because National City was fully aware of Otto Candies' transactions and level of involvement with the Debtors, National City required Otto Candies to execute a letter ("Confirmation Letter") dated November 27, 2006 immediately prior to closing the Diamond Loan.[24]   The Confirmation Letter signed by Otto Candies expressly (1) acknowledged that the Diamond Loan would be secured by a first preferred ship mortgage on the DMT Diamond in favor of National City and (2) confirmed, *inter alia*, that (a) the debt evidenced by the Candies Note was to be converted into common stock, (b) DM1 was not a party to the Vessel Operating Agreement between Otto Candies and DMT, and (c) DM1 had "no further obligations to or liabilities of any kind to Otto Candies" (emphasis added).

Otto Candies' statements in the Confirmation Letter either expressly or implicitly confirmed that the DMT Diamond would be free and clear of all liens at the closing on the Diamond Loan and DM1 would not be responsible for or incur future obligations for seaman's wages or costs under the Vessel Operating Agreement as of November 27, 2006.

Subsequently, on June 18, 2007, National City assigned all of its right, title and interest in the Diamond Loan Agreement, Diamond Note, Diamond Mortgage and other loan documents to GE.[25]

**4.     Otto Candies' Sale of Other Vessels to Debtor**

Just as Otto Candies arranged for the Debtors' purchase of the DMT Diamond, Otto Candies sold the DMT Topaz (formerly known as the Agnes Candies) and the DMT Sapphire vessels (formerly known as the Kelly Ann) to the Debtors pursuant to Vessel

---

[23]     *See* Diamond Mortgage (Ex. "3" to Shores Affid.).
[24]     *See* Confirmation Letter dated November 27, 2006 (Ex. "4" to Shores Affid.).
[25]     *See* Assignment dated June 18, 2007 (Ex. "5" to Shore's Affid.).

Purchase Agreements, each dated December 7, 2007.[26]   Upon information and belief, Otto Candies received 13,197 shares of DMT stock in consideration for the sale of the two vessels.[27]

During this same time, Otto Candies facilitated the Debtors' purchase of the Emerald vessel by assigning its shipbuilding contract with Bender Shipbuilders to DM2.[28]  The Debtors' purchase of the DMT Emerald was financed by a $41.4 million loan made by Merrill Lynch Business Financial Services, Inc. ("Merrill Lynch") to DM2. GEBFS became the holder of the Emerald loan after Merrill Lynch was acquired by a subsidiary of GE Capital.[29]

By May 2008, Otto Candies had become the 2nd largest shareholder in the Debtors, holding 38.34% of the outstanding common shares of stock.[30]

**5.      Otto Candies' Participation in DMT Board and Shareholder Meetings**

As further evidence of Otto Candies intertwinement with the business operations of the Debtors, the Debtors corporate records establish that officers and directors of Otto Candies attended and participated in the Debtors' Board of Directors and Shareholder meetings between 2004 and 2008.  Specifically, Otto Candies, Jr., Otto Candies III and Paul Candies have each attended DMT Board of Directors Meetings from time to time as invited guests since 2005.[31]   In addition, Otto Candies, Jr. and Otto Candies III also

---

[26]   *See* Vessel Purchase Agreements dated December 7, 2007 (attached to Otto Candies' Response to Request No. 13 of GE's Rule 2004 Request for Production) (Ex. "N").

[27]   *See id.*

[28]   *See* Assignment of Contract (Ex. "6" to Shores Affid.).

[29]   Merrill Lynch's name was changed to GEBFS.  *See* Affidavit of Dale Shores.

[30]   *See* Timeline regarding involvement of Otto Candies, LLC in DMH and DMT (Defendants' Exhibits in connection with October 18, 2010 hearing on Motion to Dismiss Complaint) (Ex. "O").

[31]   *See* Minutes of the DMT Board of Directors' Meetings for November 14, 2005; July 18, 2006 and January 29, 2007 (Ex. "7" to Bittner Affid.).

attended an Executive Committee Meeting during this period.[32] Otto Candies III, also served at one time as a Director of DMH.[33]   Finally, Otto Candies, Jr. served on an Advisory Committee formed by and for the benefit of the Debtors.[34]

In summary, the Debtors' corporate and business records unequivocally prove that Otto Candies' chartered and sold vessels to the Debtors, provided crews for the Debtors vessels, loaned money to the Debtors, became a significant shareholder of the Debtors, ostensibly helped "grow" the Debtors' business, and otherwise managed the operations of the vessels from 2004 through and including the Petition Date.   It is undisputed that Otto Candies was intertwined with the Debtors as a shareholder, investor in, and advisor to the Debtors.

**6.      Debtors' Default Under Diamond Loan and Debtors' Bankruptcy Filings**

The Debtors and/or Otto Candies failed to maintain the Diamond in good working condition as required under the Diamond Loan Documents.   According to the Debtors' maintenance records for the DMT Diamond, the DMT Diamond was in dry dock for almost four months in 2008 due to needed repairs.[35]   All the while Otto Candies allegedly provided crews to the vessel and accrued unpaid charges.[36]

The DMT Diamond was out of service in 2009 due to a broken "z" drive.[37]   At this same time, Otto Candies continued to bill DMT approximately $190,000 a month for crew allegedly provided for the vessel.[38]   With no funds to make repairs, the Debtors put

---

[32]   *See* Minutes of Executive Committee Meeting dated September 9, 2008 (Bates-stamped Doc. No. NJK001348-NJK001351) (Ex. "P").
[33]   *See* Minutes of DMH Board of Directors' Meeting dated October 13, 2008 (Ex. "8" to Bittner Affid.).
[34]   *See* December 16, 2004 Minutes (Ex. "5" to Bittner Affid.).
[35]   *See* DMT's Diamond Repair Log (Ex. "Q").
[36]   *See* Otto Candies' proof of claim no. 8 filed in Case No. 09-39315 (Ex. "K") and invoices (attached to Otto Candies' Response to Request No. 18 of GE's Rule 2004 Request for Production) (Ex. "R").
[37]   *See* DMT Deficiency Report dated September 4, 2009 and related email correspondence (Ex. "S").
[38]   *See* (Ex. "K").

the DMT Diamond in cold storage in October 2009. Otto Candies did not cease accruing crewmen's wages for the DMT Diamond until October 31, 2009.[39] Notwithstanding alleged arrearages of approximately $4.6 million owed by DMT, Otto Candies' final invoice showed no unpaid balance.

On December 4, 2009, the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. As of that date, a total of $13,796,587.31 in principal, accrued interest, and other charges were due and owing to GE under the Diamond Note.[40]

On January 6, 2010, John Bittner ("CEO") was appointed Chief Restructuring Officer for the Debtor.

On February 19, 2010, Otto Candies filed a proof of claim in DM1's bankruptcy case asserting an alleged preferred maritime lien against the DMT Diamond in excess of $5.6 million.[41]

The CRO decided to liquidate the Debtors' assets and filed a joint liquidating plan of reorganization for the Debtors on March 15, 2010, which was supplemented on June 1, 2010 ("Plan").

On June 2, 2010, the Bankruptcy Court entered a Confirmation Order confirming the Plan and approved the sale of the Debtors' assets.

On June 16, 2010, DM1 filed Plaintiff's Original Complaint (i) to Interplead Funds, (ii) to Determine the Extent, Validity and Priority of Claims to Proceeds of the DMT Diamond, and (iii) to Determine Ownership of Related Equipment and Properly

---

[39] *See* Ex. "K".
[40] *See* GE's Proof of Claim no. 8 filed in Case No. 09-39315.
[41] *See* Otto Candies' Proof of Claim no. 3 filed in Case No. 09-31315 (Ex. "T").

Allocate Proceeds from the Sale Thereof, although the sale of the DMT Diamond had not occurred.[42]

On July 9, 2010, the DMT Diamond along with certain personal property was sold to Seacor for $10 million.[43]

On October 4, 2010, DM1 deposited the Diamond sales proceeds in the amount of $9,915,597.26 and sales proceeds in the amount of $113,181.20 for the sale of certain Related Equipment (as defined in the Purchase and Sale Agreement), for a total of $10,028,778.46 into the Registry of the Court.[44]

## LAW AND ARGUMENT

### A.    SUMMARY OF ARGUMENT

Otto Candies claims to be the holder of a preferred maritime lien against the proceeds of the DMT Diamond for wages and costs for crewman who worked aboard the DMT Diamond pursuant to the Vessel Operating Agreement executed by and between DMT and Otto Candies in 2005.

GE disputes the Otto Candies' alleged lien because, under applicable Fifth Circuit maritime law, the lien is invalid.  In addition, Otto Candies is estopped from asserting a preferred maritime lien because it allowed its alleged lien to accrue for almost three years without taking any action to collect the debt or keep it from spiraling out of control.  Otto Candies' conduct in this manner flies in the face of any reasonable, prudent business practice.

---

[42]   *See* Plaintiff's Original Complaint filed in Adv. No. 10-03271. (Doc. No. 1).

[43]   *See* Purchase and Sale Agreement (Ex. "C" to Debtors' Plan Supplement filed June 1, 2010 (Doc. No. 506) in Case No. 09-39313).

[44]   *See* Order Granting Motion to Compel entered on September 27, 2010 in Adv. No. 10-03271 (Doc. No. 91) and docket entries regarding deposits made into the Registry of the Court.

Otto Candies' own proof of claim shows that the company orchestrated the accrual of a lien against the vessel. Otto Candies' claim reveals that it began accruing lien charges for seaman's wages and costs against the DMT Diamond on December 1, 2006, **which was the day after the closing of the Diamond Loan.**  Hence, it is easily deduced that Otto Candies planned to begin accruing a lien at the time the Diamond Loan was made.

As has already been established, Otto Candies was a sophisticated participant in vessel financings and vessel operating agreements and its actions support that Otto Candies conspired against National City and later GE to accrue wage claims against the vessel without notice to GE.  Regardless, the alleged maritime lien now being asserted by Otto Candies is both invalid and unenforceable and, therefore, should be deemed invalid by the Court.  In the alternative, if the Court finds that Otto Candies is entitled to a lien for crewmen's wages, the lien should be subordinated to GE's preferred maritime mortgage.

In the alternative, only if this Court finds that Otto Candies has a valid maritime lien that has priority over GE's first preferred ship mortgage (which GE vehemently denies), Otto Candies' recovery is limited by the "dead ship" doctrine because the DMT Diamond has been in storage since October 19, 2009.

## B.    MARITIME LAW ESTABLISHES PRIORITY

Under bankruptcy law, property rights of the debtor and creditors are generally determined by state law. *See Butner v. United States*, 440 U.S. 48 (1979).  As the Supreme Court recognized: "Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Id.* at 141-42.  State law is

applied to ownership interests as well as security interests. *Id.* at 142. Maritime liens are an exception to this general rule because the vessels are federally documented by registration with the United States Coast Guard, and it would be contrary to federal law to allow state law to govern. *See In re Alberto*, 823 F.2d 712 (3rd Cir. 1987). *See also McCorkle v. First Pennsylvania Banking & Trust Co.*, 459 F.2d 243, 246 n.2 (4th Cir. 1972). Thus, resolution of the lien priority dispute between GE and Otto Candies is determined by federal maritime law. *See id.*

It is axiomatic that a lien is a charge on property for the payment of a debt. A maritime lien is a special lien that arises by statute or by operation of law. Invented in the nineteenth century, a maritime lien is a rough security device created to keep ships moving in commerce while preventing them from escaping their debts by sailing away. *Williamson v. Winningham*, 186 P.2d 644, 650 (1947); Toy, *Introduction to the Law of Maritime Liens*, 47 Tul.L.Rev. 559 (1973); *In re Riffe Petroleum Co.*, 601 F.2d 1385, 1385-89 (10th Cir. 1979). The maritime lien is unique to admiralty law and has characteristics that differ from other forms of liens. Schoenbaum, *Admiralty and Maritime Law*, 2nd Ed. (1994).

A maritime lien is created by various transactions and occurrences in admiralty jurisdiction that give rise to a maritime claim. *E.S. Binnings, Inc. v. M/V Saudi Riyadh*, 815 F.2d 660 (11th Cir. 1987). Most maritime liens arise by operation of general maritime law, but some are created by statute, such as the Ship Mortgage Act and the Federal Maritime Lien Act. 46 U.S.C. 31301-31343 and 46 U.S.C. 31341-31343.

The common maritime liens recognized under maritime law are:

a.      Wages of the ship's master and crew.

b.      Salvage operations.

c.   Claims for breach of a charter party.

d.   Preferred ship mortgages.

e.   Claims under maritime contract for repairs, towage, pilotage, wharfage, and a wide variety of other "necessaries."

f.   Claims for maritime torts including personal injury and death, and collision claims.

g.   Claims for damage or loss of cargo.

h.   Clams by the carrier of cargo for unpaid freight and demurrage.

i.   Pollution claims.

*See,* e.g., *The John G. Stevens*, 170 U.S. 113, 18 S.Ct. 544, 42 L.Ed. 969 (1898); *A.L. Veverica Salvage Co. v. Drill Barge Buccaneer No. 7*, 488 F.2d 880 (5th Cir. 1974); *The Odysseus III*, 77 F.Supp. 297 (S.D.Fla. 1948); *see also, International Marine Towing, Inc. v. Southern Leasing Partners, Ltd.*, 722 F.2d 126 (5th Cir. 1983); *McCorkle v. First Pennsylvania Banking & Trust Co.*, 459 F.2d 243 (4th Cir. 1972); 46 U.S.C. 31341-31343; *Merchants National Bank of Mobile v. Dredge General G.L. Gillespie*, 663 F.2d 1338 (5th Cir. 1981), *cert. dismissed*, 456 U.S. 966, 102 S.Ct. 2263, 72 L.Ed.2d 865 (1982).

When a first preferred ship mortgage is involved, such as GE's Diamond Mortgage, additional priority rules come into play. The Ship Mortgage Act, section 31326(b)(1), provides that upon judicial sale in the enforcement of a ship mortgage, the preferred mortgage lien shall have priority over all claims against the vessel except: (1) preferred maritime liens and (2) costs and expenses *in custodia legis*. Under the statute, a preferred maritime lien is defined as "a maritime lien on a vessel:

(A)   arising before a preferred mortgage was filed under section 31322 of this title;

(B)   for damages arising out of maritime tort;

(C)     for wages of a stevedore * * *;

(D)     for wages of the crew of the vessel;

(E)     for general average; or

(F)     for salvage, including contract salvage * * *."

46 U.S.C. 31301(5).

GE is entitled to special protection as the holder of a preferred ship mortgage. The legislative history of the Ship Mortgage Act of 1920 indicates the legislation was intended to draw investment capital to the shipping business and protect their interests. *See J. Ray McDermott & Co., Inc. v. The Vessel Morning Star*, 457 F.2d 815 (5th Cir. 1972).

GE's Motion for Summary Judgment establishes that Otto Candies' alleged maritime lien for crewman wages and costs is invalid and should be declared invalid.  In the alternative, assuming *arguendo* that Otto Candies is found to hold a valid lien on the DMT Diamond for crewman wages, the lien should be subordinated to the preferred ship mortgage held by GE.

**C.      REQUIREMENTS FOR SUMMARY JUDGMENT**

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Brown v. City of Houston, Tex.*, 337 F.3d 539, 540-41 (5th Cir. 2003).  A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*, 271 F.2d 624, 626 (5th Cir. 2001).  To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could

resolve the issue in favor of either party. *Anderson,* 477 U.S. at 250; *TIG Ins. Co. v. Sedgwick James of Wash.,* 276 F.3d 754, 759 (5th Cir. 2002).

The movant must inform the Court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. *Celotex Corp.,* 477 U.S. at 323; *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). If the moving party can show an absence of evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment. *Celotex Corp.,* 477 U.S. at 322. In response to a showing of lack of evidence, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case, demonstrating that genuine issues of material fact do exist which must be resolved at trial. *Id.* at 324.

When considering the evidence, "[d]oubts are to be resolved in the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." *Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001). See also *Boston Old Colony Ins. Co. v. Tiner Assoc. Inc.*, 288 F.3d 222, 227 (5th Cir. 2002). The Court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." *Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir. 1987).

However, the non-moving party must show more than "some metaphysical doubt as to the material facts." *Meinecke v. H & R Block of Houston*, 66 F.3d 77, 81 (5th Cir. 1995). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden.

*Brown*, 337 F.3d at 541, *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002).  The Court should grant summary judgment if, after an adequate period of discovery, the nonmovant fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.

**D.   OTTO CANDIES' ALLEGED LIEN IS INVALID BECAUSE IT IS A STOCKHOLDER AND IS NOT A STRANGER TO THE VESSEL**

It is well established that the relationship between the creditor and the vessel is the threshold question in considering priority of liens under maritime law, and one that Otto Candies cannot overcome.  In *Sasportes v. M/V Sol de Copacabana*, 581 F.2d 1204 (5th Cir. 1978), the Fifth Circuit held that "an owner, part-owner, or joint venturer cannot hold a maritime lien."  Id. at 1207; (citing *Fathom Expeditions, Inc. v. M/T Gavdrion*, 402 F.Supp. 390, 397 (M.D.Fla. 1975)).  "A stockholder in a corporation owning a vessel is regarded as a part owner."  *See The Odysseus III*, 77 F. Supp. 297, 299 (S.D.Fla. 1948).

In *Sasportes*, Star-Kist Foods, Inc. claimed a maritime lien on a foreign-owned vessel for necessaries and crewman's wages it paid on behalf of the owner of the vessel. *See Sasportes*, 581 F.2d at 1207-08.  The district court found that Star-Kist was a joint venturer because it had an exclusive contract to buy all of the vessel's catch at a stated price and was entitled to a penalty if the owner elected to sell its catch elsewhere under certain conditions.  As a result, the court concluded that Star-Kist was not entitled to a lien under applicable maritime law. *Id.*

On appeal, the Fifth Circuit disagreed with the district court's finding that Star-Kist was a joint venturer.  The appellate court stated that the evidence did not show Star-Kist participated in the company's profits or had exerted any "significant control over the

[vessel] beyond that which any creditor and contract obligee might have.  It did not, for example, dictate [the owner's] decisions about where to fish, whom to hire, what technique to use, and the like." *Id.* at 1209.  For these reasons, the Court of Appeals concluded that the District Court erred in finding that Star-Kist was a joint venturer. *Id.* at 1210.

In *Sasportes,* the Fifth Circuit recognized there is a presumption under the Federal Maritime Lien Act that creditors who provide repairs, supplies and other necessaries are relying on the credit of the vessel and not only the "personal credit of the owner." *Id.* at 1209.  The Court of Appeals disagreed with the lower court's finding that Star-Kist had relied on the "personal credit of the owner," noting that Star-Kist invoiced the vessel itself as opposed to the owner which "practice suggests that it intended to rely on the credit of the ship." *Id.* at 1210.  Based upon these findings, the Fifth Circuit reversed the holding that Star-Kist was not entitled to a maritime lien and remanded for further findings on the amount of Star-Kist's claim for necessaries. *Id.* at 1210-11.

Although the *Sasportes* case turned on whether the creditor was a joint venturer of the owner, the Court's statement of the law is correct, remains good law in this Circuit, and comports with the law in other circuits which have addressed the validity and enforceability of a maritime lien asserted by an owner or shareholder.  The *Sasportes* case is also instructive as to actions of a creditor which show it was not a "stranger to the vessel" and relied on the credit of the vessel owner.

For example, in *Mullane v. Chamber*, 438 F.3d 132 (1st Cir. 2006), the First Circuit Court of Appeals ruled that "maritime liens … are intended to safeguard interests

of strangers to the vessel, not the vessel owner or those who control the vessel's affairs."
(emphasis added.).

The Eleventh Circuit affirmed that "shipowners, joint venturers, investors or
shareholders in a shipowning corporation cannot have a valid maritime lien on a vessel in
which they own an interest." *In re SeaEscape*, 191 B.R. 944 (S.D.Fla. 1995), *aff'd* 98
F.3d 1353 (11th Cir. 1996). (emphasis added.). In *SeaEscape*, Maduro Travel, a travel
agency, booked airline tickets for crew members as well as offered a concierge or
bellman program for the Debtor's vessels. *Id.* at 946. The travel agency was a wholly-
owned subsidiary of a company that held 9.31% of the shares of the debtor. *Id.* After the
debtor filed chapter 11, the travel agency filed secured proofs of claim asserting maritime
liens against four of the debtor's vessels. Certain parties who had guaranteed payment of
valid prepetition maritime lien claims objected to Maduro Travel's claims on the basis
that Maduro Travel was an insider and not entitled to a maritime lien. *Id.* at 947.

At the hearing before the bankruptcy court, the travel agency denied it was an
insider and claimed it was a "stranger" to the vessels. *Id.* at 947-948. The bankruptcy
court rejected Maduro Travel's contentions, and specifically found an "extensive inter-
relationship" between Maduro Travel, and S.E.L. Maduro, the 10% shareholder of the
debtor. The facts included that Maduro Travel and S.E.L. Maduro had the same president
and capital contributions made by Maduro to the debtor were applied to the creditor,
Maduro Travel. The district court stated: "In sum, Maduro Travel acted in conjunction
with its corporate parent, S.E. L. Maduro and its related corporation, Ripe, to discharge
those stockholder obligations to SeaEscape. It is, therefore, clear that Maduro Travel is

not a stranger to SeaEscape or the vessels and as such cannot claim liens. (emphasis provided)." *Id.* at 952.

The bankruptcy court in *SeaEscape* also held that Maduro Travel was estopped from claiming maritime liens on the vessel because it had allowed arrearages to accrue for six to nine months for airline tickets and never received payment on the concierge services. *Id.* The district court upheld the district court's finding that allowing these arrearages to occur was "improvident" and, therefore, Maduro Travel was estopped from claiming a maritime lien. *Id.*

The *SeaEscape* case involved facts somewhat similar to the instant case. In *SeaEscape*, the lien claimant (whose parent entity was a shareholder of the debtor) allowed the expenses to accrue for an extended period of time—six to nine months. In this case, Otto Candies has been a shareholder in DMT since at least November 27, 2006, the date of the Diamond Loan, and allowed its liens to accrue for almost three years. In addition, Otto Candies became a significant shareholder <u>prior</u> to the time it commenced accruing the wages and maritime lien it seeks to enforce against the proceeds of the DMT Diamond. The operative date for reviewing the relationship between the creditor and the vessel owner should be the date the creditor begins to accrue the lien. *See Riffe Petroleum Co. v. Cibro Sales Corp.*, 601 F.2d 1385 (10th Cir. 1979). The Fifth Circuit has unequivocally held that an owner, part-owner, or joint venturer cannot hold a maritime lien against a vessel in which it owns an interest. *See Sasportes*, 581 F.2d at 1207. The federal courts have further held that a stockholder in a corporation owning a vessel is regarded as part owner of that vessel. *See In re SeaEscape*, 191 B.R. at 952-53. As a part owner, Otto Candies cannot hold a lien against the DMT Diamond.

Moreover, Otto Candies' involvement in the Debtors' business operations establishes that it should not be allowed any maritime lien because it was anything but a "stranger" to the Debtors. In the fall of 2004, DMT's former President announced the proposed purchase of the DMT Diamond from Otto Candies and described Otto Candies as a "strategic partner" of DMT that would provide management and crew for the vessel and "open doors to additional work in the Gulf and around the world."

In December 2004, the DMT Board of Directors approved the purchase of the DMT Diamond from Otto Candies. Otto Candies confirmed in the Term Sheet that it would "provide its assistance on a non-exclusive basis in providing introductions and business contacts to DMT with a view to enhancing the business ...." Otto Candies further agreed that, at closing on the sale of the DMT Diamond, it would "manage the operations of the Ship, crew and maintenance." As a result of these agreements and the Vessel Operating Agreement, Otto Candies positioned itself to be actively involved in the business affairs of the Debtors by operating the Debtors' main assets. Otto Candies' involvement and influence in the Debtors' business affairs is further illustrated by the fact it sold the other three vessels to the Debtors and received stock, in DMT as the entire purchase price for the sale of two of the vessels.

The evidence further shows that Otto Candies, Jr., Otto Candies III and Paul Candies have each attended Special Shareholder's Meeting of DMT as invited guests as early as 2004. During that same period, Otto Candies, Jr. served on an Advisory Committee formed by and for the benefit of the Debtors to advise them in different aspect of the business. In addition, Otto Candies III, later served on the Board of Directors of DMH.

With full knowledge of the Debtors' business operations and financial affairs, Otto Candies accrued crewman's wage claims beginning December 2006. Otto Candies invoiced DMT rather than the vessel owner, DM1, or the vessel itself and received no payments for over two years. Amazingly, Otto Candies' invoices never reflected a past due amount. No reasonable third party in Otto Candies' position would have continued providing crews to a vessel for "free." Furthermore, by early 2009, the DMT Diamond was out of commission due to repair and maintenance issues, and clearly was not going to be generating any revenue to fund its operations or pay its crew. The case law holds that maritime liens are intended to safeguard interests of "strangers to the vessel," not the vessel owner or those who control the vessel's affairs. There can be no doubt that Otto Candies was not a "stranger" to the vessel. For these reasons, Otto Candies' alleged maritime lien should be held invalid.

**E.      OTTO CANDIES IS ESTOPPED FROM ASSERTING A MARITIME LIEN**

The second mutually exclusive reason why Otto Candies alleged preferred maritime lien for seaman's wages is invalid is because Otto Candies allowed the alleged wages and costs it paid to significantly accrue without making any effort to collect the debt or disclose the existence of the debt and alleged lien to third parties who were contracting with the Debtors such as GE.

Courts have held that a party who allows the vessel's debts to build will be denied a lien. In *In re SeaEscape*, the court found that the lien claimant's action in "permitting the arrearages of such magnitude to accrue was improvident," and held the claimant was estopped from asserting its liens due to its failure to promptly enforce liens. *In re SeaEscape*, 191 B.R. at 948.

Even where a court recognizes a claim, the lien may not have priority over others where the creditor "was ultimately familiar with the financial problems" of the vessel and "continued to allow the vessel and its operators to slip further into debt." *Cantieri Navali Riuniti v. M/V Skyptron*, 621 F.Supp. 171, 187 (W.D.La. 1985).

Otto Candies has been paying seaman's wages to the crews aboard the DMT Diamond (in lieu of DMT) since December 1, 2006, (the day after the Diamond Loan Agreement and related documents were executed) and now 4 years later claims it is entitled to enforce a maritime lien against the vessel in excess of $5.6 million. At no time between the December 1, 2006, and this adversary did Otto Candies disclose the debt to third parties, make any attempt to collect the debt or enforce a lien against the DMT Diamond, DM1 or any of the Debtors. Rather, it continued to provide crews to DMT and DM1 and knowingly allowed the debt owed by DMT to increase.

One can only conclude that Otto Candies intentionally allowed the wage claim to mount based upon Otto Candies' own inactions. Allowing the debt to accrue without demanding payment at any point indicates that Otto Candies never expected and the Debtors never intended to repay any portion of the wages and costs Otto Candies allegedly paid to the crew under the Vessel Operating Agreement because no reasonable business would ever let such a debt accrue without making any collection efforts or, alternatively, terminating the Vessel Operating Agreement based upon DMT's breach.

Otto Candies permitted the arrearages to amount to such magnitude that its failure to promptly enforce such liens should estop Otto Candies from asserting an alleged preferred maritime lien now. In the alternative, if it is determined that Otto Candies'

holds a valid maritime lien, the lien should be subordinated to the first preferred ship mortgage held by GE.

**F.    IN THE ALTERNATIVE, OTTO CANDIES CLAIM IS LIMITED BY THE "DEAD SHIP" DOCTRINE**

In the alternative, if the Court finds that Otto Candies is entitled to a maritime lien for crewmen's wages, Otto Candies' alleged secured claim should be significantly reduced based on the "dead ship" doctrine.

In *Hayford v. Doussony*, 32 F.2d 605 (5th Cir. 1929), aff'd 42 F.2d 439 (1930) and *Johnson v. Oil Transport Co.*, 440 F.2d 109 (5th Cir.), *reh'ing den.*, 445 F.2d 1402 (1971), the Fifth Circuit confirmed that a vessel that is withdrawn from navigation may not be the object of a maritime lien.

To determine whether a ship is subject to the "dead ship" doctrine, the Fifth Circuit uses the "in navigation standard" set forth in *New England Fish Co. v. Barge Sonya*, 332 F.Supp. 462 (D.Alaska 1971) and *First Bank and Trust Co. v. Knachel*, 999 F.2d 107 (5th Cir. 1993). Whether a ship is in navigation is a factual issue. *Fredieu v. Rowan Companies*, Inc., 738 F.2d 651, 654 (5th Cir. 1984). A ship is considered "in navigation" when there is an intention to put the vessel out to sea and it is being prepared for the voyage. *New England Fish*, 332 F.Supp. at 467-68. In *Knachel,* the M/V Four Point was being prepared for a voyage to Haiti and, therefore the "dead ship" doctrine did not apply. That is not the case in the present matter.

Here, the DMT Diamond has been in cold storage since October, 2009.[45] The repairs being performed while the vessel was in storage were not being done in preparation of a certain voyage, but rather, the repairs were being performed to make the

---

[45]    *See* Shores Affid.

ship seaworthy. *Id.* The DMT Diamond did not have a pending charter, was not under contract, and there was no voyage anticipated after the repairs were complete while the vessel was owned by DM1. *Id.*

Thus, the DMT Diamond was a "dead ship" that had been taken out of navigation and no liens could attach to the DMT Diamond by Otto Candies or any other creditor after that date. Nevertheless, Otto Candies continued to accrue wage and cost claims pursuant to the following terms and conditions of the Vessel Operating Agreement:

(a)     DMT shall be responsible for the Vessel's fuel, lube and cordage for the DMT Diamond. These and other related expenses not listed below incurred in respect of the Vessel's operation shall be rebilled to DMT at actual cost plus twelve percent (12%).

(b)     DMT shall be responsible for Vessel maintenance and repair costs at a rated of One Thousand Six Hundred Seven ($1,607) Dollars per day.

(c)     DMT shall reimburse Candies for manning the vessel as follows. Crew members will be billed as he following daily rates:

Captains – $607.32 each per day;
Mates – $471.58 each per day;
Engineers – $551.45 each per day;
Deckhands – $305.42 each day.

(d)     DMT shall also pay a fixed fee of $94 per day which applies regardless of the number of crew on board to defray miscellaneous crew-related expenses (training, drug testing, etc.).

Thus, alleged lien amounts accrued after October, 2009, and the interest thereon, must be deducted from Otto Candies' alleged maritime lien and Otto Candies' interest should also be reduced accordingly.

WHEREFORE, GE respectfully requests that this Court issue a Partial Summary Judgment declaring Otto Candies' alleged preferred maritime lien invalid *in toto* or, in the alternative, subordinating Otto Candies' lien, if any, to GE's first preferred ship

mortgage.  In the further alternative, and only if this Court finds that Otto Candies has a valid first preferred maritime lien, GE requests this Court enter a Partial Summary Judgment reducing Otto Candies' claim and denying any amounts which accrued after October 19, 2009.  GE seeks all other relief to which it may be entitled to in law and equity.

Respectfully submitted,

ADAMS AND REESE LLP


By: __/s/ Susan C. Mathews_____
John M. Duck *
Federal Bar No. 17156
Susan C. Mathews
State Bar No. 05060650
FBN: 8479
Michael N. Mire
State Bar No. 24010757
FBN: 599148
4400 One Houston Center
1221 McKinney
Houston, TX  77010
Telephone:  (713) 652-5151
Facsimile:  (713) 652-5152

*Attorneys for Defendant,*
*General Electric Capital Corporation*


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent via electronic mail, certified mail, return receipt requested, regular mail, and/or facsimile to the following counsel of record on this 6th day of January, 2011.

_/s/ Susan C. Mathews_____
Susan C. Mathews

---

* Admitted in the State of Louisiana.

## SERVICE LIST

| ***Counsel for Plaintiff – Deep Marine 1, LLC*** | ***Deep Marine Liquidating Trust*** |
|---|---|
| William Alfred Wood, III<br>Jason Gary Cohen<br>Bracewell & Giuliani LLP<br>711 Louisiana St, Ste 2300<br>Houston, TX 77002<br>713-221-1416<br>Fax : 713-221-1212<br>Email: trey.wood@bgllp.com | John Bittner, Liquidating Trustee<br>Grant Thornton LLP<br>1717 Main Street<br>Suite 1500<br>Dallas TX 75201<br>214-561-2300<br>Fax: 214-561-2370<br>Email: John.Bittner@GT.com |
| ***Counsel for Defendant – Otto Candies, LLC*** | ***Defendant – NREC Power Systems, Inc.*** |
| Thomas S Henderson, III<br>Thomas S Henderson, Attorney at Law<br>711 Louisiana, Ste 3100<br>Houston, TX 77002<br>713-227-9500<br>Fax: 713-620-3023<br>Email: thenderson@tsh-atty.com<br><br>David Carrigee<br>Baldwin Haspel Burke & Mayer, LLC<br>1100 Poydras St., Suite 2200<br>New Orleans, Louisiana 70163 | Bryan Chaisson<br>CEO/Vice President<br>5222 Hwy 311<br>Houma, LA 70360-2878<br>985-872-5480<br>Fax: 985-872-0611 |